# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LUIS SEGOVIA, JOSE ANTONIO TORRES, PAMELA LYNN COLON, TOMAS ARES, ANTHONY BUNTEN, LAVONNE WISE, IRAQ AFGHANISTAN AND PERSIAN GULF VETERANS OF THE PACIFIC, and LEAGUE OF WOMEN VOTERS OF THE VIRGIN ISLANDS,

                   Plaintiffs,

   v.

BOARD OF ELECTION COMMISSIONERS
  FOR THE CITY OF CHICAGO,

LANGDON D. NEAL,
  in his official capacity as Chairman of the
  Board of Election Commissioners for the
  City of Chicago,

KAREN KINNEY,
  in her official capacity as Rock Island
  County Clerk,

UNITED STATES OF AMERICA,

ASHTON CARTER,
  in his official capacity as the Secretary of
  Defense,

FEDERAL VOTING ASSISTANCE
  PROGRAM,

MATT BOEHMER,
  in his official capacity as Director of the
  Federal Voting Assistance Program,

                  Defendants.

Case No. _____

## COMPLAINT

Plaintiffs Luis Segovia, Jose Antonio Torres, Pamela Lynn Colon, Tomas Ares, Anthony Bunten, Lavonne Wise ("Individual Plaintiffs"), Iraq Afghanistan and Persian Gulf Veterans of the Pacific, and League of Women Voters of the Virgin Islands ("Organizational Plaintiffs"), on personal knowledge as to their own acts and upon information and belief reasonably formed after reasonable inquiry as to the acts of others, hereby file this Complaint against Board of Election Commissioners for the City of Chicago, Langdon D. Neal, Karen Kinney, the United States of America, Ashton Carter, Federal Voting Assistance Program, and Matt Boehmer, and allege as follows:

## NATURE OF THE ACTION

1. This action concerns the federal Uniformed and Overseas Citizens Absentee Voting Act, Pub. L. No. 99-410, codified as amended at 52 U.S.C. §§ 20301 to 20311 ("UOCAVA"), and the Illinois statute implementing its requirements, known as the Illinois Military and Overseas Voter Empowerment ("MOVE") law, *see* 10 Ill. Comp. Stat. 5/20-1 *et seq.*

2. Pursuant to these statutes, former Illinois residents are allowed to continue voting in Illinois by absentee ballot for President and for voting representation in the U.S. Senate and U.S. House of Representatives if they reside in the Northern Mariana Islands ("NMI"), American Samoa, or in a foreign country, but not if they reside in Guam, Puerto Rico, or the U.S. Virgin Islands.

3. This disparate treatment violates the U.S. Constitution's guarantee of equal protection. Equal protection rights are guaranteed by the Equal Protection Clause of the Fourteenth Amendment and the equal-protection component of the Due Process Clause of the Fifth Amendment to the U.S. Constitution. *See United States v. Windsor*, 133 S. Ct. 2675, 2695

(2013).  The Equal Protection Clause provides:  "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

4.      As President Barack Obama emphasized in his 2015 State of the Union Address, invoking the 50th anniversary of the March on Selma and the Voting Rights Act, "surely we can agree that the right to vote is sacred, that it's being denied to too many[.]"  1 Pub. Papers 36 (Jan. 20, 2015).  In his 2014 State of the Union Address, he declared that "[c]itizenship means standing up for everyone's right to vote."  1 Pub. Papers 50 (Jan. 28, 2014).  And, in his 2013 State of the Union Address, he explained that "one of the most fundamental rights of a democracy" is the right to vote, and that "when any American, no matter where they live or what their party, are denied that right . . . we are betraying our ideals."  1 Pub. Papers 90 (Feb. 12, 2013).

5.      As Congress itself recognized in enacting predecessor legislation to UOCAVA, "the right to vote for national officers is an inherent right and privilege of national citizenship," H.R. Rep. No. 94-649, pt. 1, at 5 (1975), reprinted in 1975 U.S.C.C.A.N. 2358, 2362; and "American citizens outside the United States . . . have their own Federal stake – their own U.S. legislative and administrative interests – which may be protected only through representation in Congress and in the executive branch," *id.* at 7, 1975 U.S.C.C.A.N. at 2364.

6.      The federal and state laws at issue violate this fundamental guarantee of equal protection.  Congress selectively extended the franchise only to some U.S. citizens residing outside the States, while denying it to others who are similarly situated.  Under UOCAVA, States are required to allow former state citizens residing outside the United States or in the NMI to vote on an absentee basis in federal elections.  But under the same law, States are free to deny that right to similarly situated persons residing in the other U.S. Territories overseas.  And

Illinois law draws even further distinctions, giving preferential treatment to former Illinois citizens residing in American Samoa in addition to the NMI and places outside the United States, while denying the right to vote absentee to former Illinois citizens residing in the other U.S. Territories overseas.

7.     The Constitution does not permit Congress and the States to pick and choose which voters living outside the States are able to maintain their right to vote for President and voting representation in the U.S. House and Senate.

8.     Neither Congress nor Illinois has offered any explanation or justification for these arbitrary classifications, nor could they.

9.     Plaintiffs are individuals – Luis Segovia, Jose Antonio Torres, Pamela Lynn Colon, Tomas Ares, Anthony Bunten, and Lavonne Wise – and organizations – Iraq Afghanistan and Persian Gulf Veterans of the Pacific and League of Women Voters of the Virgin Islands – who are injured by virtue of the Defendants' disparate treatment of former state residents residing in the Territories and overseas.  The Individual Plaintiffs, who are former Illinois residents, are not permitted to vote in federal elections in Illinois, even though former Illinois residents residing in the NMI, American Samoa, or a foreign country are permitted to do so under Illinois law.  The Organizational Plaintiffs count former Illinois residents among their members, and the inability of their members to vote in federal elections in Illinois diminishes their communities' access to the political process.

10.     Plaintiffs seek a declaratory judgment that UOCAVA and Illinois MOVE violate the Fifth Amendment and the Fourteenth Amendment, respectively.  Plaintiffs also seek an injunction directing Defendants Board of Election Commissioners for the City of Chicago,

Langdon D. Neal, and Karen Kinney to accept Individual Plaintiffs' applications to vote absentee in federal elections in Illinois.

**PARTIES**

11.    a.    Plaintiff Luis Segovia is a U.S. citizen born in Chicago, Illinois in 1978, where he was a resident until 2010 when he became a resident of Guam.  Defendants will not permit Mr. Segovia to vote for President or for voting Members of Congress by virtue of his residence in Guam.  Under UOCAVA and Illinois MOVE, Mr. Segovia would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if he were a resident of the NMI, American Samoa, or a foreign country.

b.    Mr. Segovia is a decorated Veteran, serving eighteen months in Iraq from 2005 to 2006 in the U.S. Army, twelve months in Afghanistan from 2008 to 2009 in the Illinois National Guard, and ten months in Afghanistan in 2013 in the Guam National Guard.  In Iraq, he served at Forward Operating Base Marez near Mosul, with a primary mission to provide security for the 2005 Iraqi elections.  He was honorably discharged in 2008, and joined the Illinois National Guard, where he was deployed to Afghanistan in 2008.  He joined the Guam National Guard in 2010 after becoming a resident of Guam.  During his second tour in Afghanistan, he thought about how he and his fellow soldiers from Guam were unable to vote for President in 2012 just months prior to deployment even though their service and sacrifice was no different than the soldiers with whom he had previously served in Afghanistan.  In fact, two of his fellow Guam soldiers were killed in duty in Afghanistan.  Mr. Segovia believes that it is a deep injustice that Guam soldiers are treated as good enough to risk dying to defend democracy, but not good enough to fully enjoy the right to vote.  Nonetheless, Mr. Segovia, who was recently promoted to the rank of Staff Sergeant, remains proud to serve his country and defend America's democratic and constitutional principles.

c.    Mr. Segovia also serves his country as a federal employee, with the Department of the Navy's civilian security forces police assigned to Anderson Air Force Base in Guam. His wife, Lulene Baza Segovia, is also a federal employee, providing administrative support services for the Guam Army National Guard.

d.    When Mr. Segovia was a resident of Chicago, he voted for President. Since residing in Guam, he is no longer able to vote for President, although he regularly votes in Guam elections. Mr. Segovia would like to be able to vote for President and have voting congressional representation in Guam, but until this is possible he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois. He believes that where one lives as a U.S. citizen should not affect one's right to vote.

12.    a.    Plaintiff Jose Antonio Torres is a U.S. citizen born in Ponce, Puerto Rico, in 1955; he currently resides in Carolina, Puerto Rico. From 1982 to 1993, he was a resident of Chicago, Illinois. Defendants will not permit Mr. Torres to vote for President or for voting Members of Congress by virtue of his residence in Puerto Rico. Under UOCAVA and Illinois MOVE, Mr. Torres would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if he were a resident of the NMI, American Samoa, or a foreign country.

b.    Mr. Torres is a Vietnam-era Veteran who has a combined 100% disability rating by virtue of injuries sustained during his military service. Mr. Torres was recruited to join the United States Army as a high school student in Ponce, Puerto Rico. In 1973, he was stationed in Germany as part of the 141st Field Artillery, a posting that required top secret clearance. In 1974, he suffered a severe back injury while serving on-duty in Germany that

5

required extended hospitalization.  As a result of his serious injuries, he was honorably discharged in 1975.

        c.       Mr. Torres became a resident of Chicago, Illinois in 1982.  In 1986, he was hired by the United States Postal Service ("USPS").  In 1993, he was transferred from Illinois to Puerto Rico.  He worked as a federal employee for USPS in Puerto Rico for another fifteen years, retiring in 2008 after 22 years of federal service.  As a federal employee in Puerto Rico, Mr. Torres was required to pay the same federal taxes, including federal income tax, as federal employees living in the States, even as he continued to be disenfranchised.

        d.       As a resident of Chicago, Mr. Torres regularly voted for President.  Upon being transferred to Puerto Rico by USPS, he was no longer able to vote for President, although he has regularly voted in Puerto Rico elections.  Mr. Torres would like to be able to vote for President and have voting congressional representation in Puerto Rico, but until this is possible he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois.  He believes that where one lives as a U.S. citizen should not affect one's right to vote.

      13.     a.       Plaintiff Pamela Lynn Colon is a U.S. citizen born in Chicago, Illinois in 1959, where she was a resident until 1992 when she became a resident of the U.S. Virgin Islands; she currently resides in St. Croix.  Defendants will not permit Ms. Colon to vote for President or for voting members of Congress by virtue of her residence in the U.S. Virgin Islands.  Under UOCAVA and Illinois MOVE, Ms. Colon would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if she were a resident of the NMI, American Samoa, or a foreign country.

b.      Ms. Colon is an attorney with a significant federal criminal defense practice. From 1996 to 2000 she served as the Assistant Federal Public Defender in St. Thomas, Virgin Islands, and is past-President of the Virgin Islands Bar Association. She has defended numerous clients in the Virgin Islands who were prosecuted for federal crimes, including several facing the possibility of life in prison, and even potentially the death penalty. Ms. Colon believes democratic accountability is the foundation of a functional and just criminal-justice system, a foundation that is lacking in the Virgin Islands because of the absence of voting representation in Congress and the right to vote for President. In her view, every American citizen should have democratic representation in the federal criminal law they are required to follow, in the federal judges who try and sentence those accused of federal crimes, and in the federal prosecutors who enforce the law.

c.      Ms. Colon's son, who is a resident of the Virgin Islands, will turn 18 next year. While he will be required to register for selective service, he will not be able to vote for President in the General Election (even though he *will* be eligible to vote in the Primary). Ms. Colon believes that if you can be drafted to serve in the military, you should be able to vote for your Commander-in-Chief. She also believes that where one lives as a U.S. citizen should not affect one's right to vote.

d.      As a resident of Chicago, Ms. Colon regularly voted for President. Once she established her residency in the Virgin Islands in 1992, she became unable to vote for President, although she has regularly voted in elections in the U.S. Virgin Islands. Ms. Colon would like to be able to vote for President and have voting congressional representation in the U.S. Virgin Islands, but until this is possible she desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois.

14.    a.    Plaintiff Tomas Ares is a U.S. citizen born in San Lorenzo, Puerto Rico in 1955, where he currently resides.  From 1967 to 2007, he was a resident of Chicago, Illinois. Defendants will not permit Mr. Ares to vote for President or for voting members of Congress by virtue of his residence in Puerto Rico.  Under UOCAVA and Illinois MOVE, Mr. Ares would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if he were a resident of the NMI, American Samoa, or a foreign country.

b.    Mr. Ares is a Vietnam-era Veteran who joined the U.S. Army in 1971 at the age of 17.  After being stationed in Germany, he was honorably discharged in 1972 on the ground that he was not of the legal age to serve.  Mr. Ares' father, who was born in Puerto Rico in 1902, served in the U.S. Army's 65th Infantry from 1920 through 1944.  His father passed away in 1979 without ever having the opportunity to vote for President, something that has always troubled Mr. Ares.

c.    As a resident of Chicago, Mr. Ares regularly voted for President.  Upon retiring in Puerto Rico, Mr. Ares can no longer vote for President, although he regularly votes in Puerto Rico elections.  Mr. Ares would like to be able to vote for President and have voting congressional representation in Puerto Rico, but until this is possible he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois.  He believes that where one lives as a U.S. citizen should not affect one's right to vote.

15.    a.    Plaintiff Anthony Bunten is a U.S. citizen born in Moline, Illinois in 1976, where he was a resident until 1997, when he became a resident of Guam.  Defendants will not permit Mr. Bunten to vote for President or for voting members of Congress by virtue of his residence in Guam.  Under UOCAVA and Illinois MOVE, Mr. Bunten would continue to be able

8

to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if he were a resident of the NMI, American Samoa, or a foreign country.

       b.    Mr. Bunten is a Veteran who joined the U.S. Navy directly out of high school in 1994. He was honorably discharged in 1997. Shortly thereafter, he moved to Guam, where he established residency in 1997 to join his now-wife, Barbara Perez Hattori. As a resident of Illinois, Mr. Bunten voted for President. Once he became a Guam resident, he was no longer able to vote for President, although he regularly votes in Guam elections.

       c.    Mr. Bunten would like to be able to vote for President and have voting congressional representation in Guam, but until this is possible he desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois. He believes that where one lives as a U.S. citizen should not affect one's right to vote.

16.    a.    Plaintiff Lavonne Wise is a U.S. citizen born in Queens, New York; she currently resides in St. Croix in the U.S. Virgin Islands. From 2003 to 2009, she was a resident of Chicago, Illinois. Defendants will not permit Ms. Wise to vote for President or for voting Members of Congress by virtue of her residence in the U.S. Virgin Islands. Under UOCAVA and Illinois MOVE, Ms. Wise would continue to be able to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois if she were a resident of the NMI, American Samoa, or a foreign country.

       b.    As a resident of Chicago in 2008, Ms. Wise voted for President by absentee ballot while temporarily working in St. Croix. Later, when she became a resident of St. Croix in 2009, she became unable to vote for President, although she regularly votes in elections in the U.S. Virgin Islands. Previously, from 1990-1992, Ms. Wise was a resident of St. Maarten, Netherland Antilles, moving there from Atlanta, Georgia. While residing in a foreign country,

Ms. Wise did not lose her right to vote for President, as she did when she began residing in the Virgin Islands.

    c.  Ms. Wise would like to be able to vote for President and have voting congressional representation in the U.S. Virgin Islands, but until this is possible she desires to vote for President and voting Members of the U.S. House and Senate by absentee ballot in Illinois. She believes that where one lives as a U.S. citizen should not affect one's right to vote.

    17.  a.  Plaintiff Iraq Afghanistan and Persian Gulf Veterans of the Pacific ("IAPGVP") is a nonprofit organization founded in 2014 whose mission is to provide opportunities to engage, enrich, and empower Pacific Island Veterans of Iraq, Afghanistan, and the Persian Gulf and their families. Its membership includes current residents of Guam who are former residents of Illinois and other States. IAPGVP seeks to honor with dignity the sacred memory of the war dead, and by doing so, ensure that the lasting legacy of the fallen is responsibility toward, not exploitation of, their sacrifice. IAPGVP was created to improve the quality of life for veterans of the Persian Gulf, Iraq, and Afghanistan era who reside in Guam, the NMI, and the Federated States of Micronesia, where thousands of veterans cannot vote for President of the United States and lack voting representation in Congress.

    b.  IAPGVP recognizes that political empowerment of Pacific Island veterans and their communities is critical to addressing the pressing needs of these veterans. IAPGVP believes that continuing political disenfranchisement contributes to the health-care crisis facing Guam veterans. While up to one in eight adults in Guam is a veteran, and while the casualty rate for Guam soldiers in Iraq and Afghanistan has been 4.5 times the national average, in 2012, Guam ranked below every State in medical-care spending per veteran. IAPGVP believes that if veterans and others in Guam who would be able to vote for President if they lived in the NMI,

American Samoa, or a foreign country could fully exercise their right to vote, it would provide

new opportunities for national political engagement related to Guam veterans issues, including

healthcare issues. IAPGVP also believes it would help create a much-needed political incentive

for Congress and the President to take action to ensure full voting rights for all of Guam's

residents. IAPGVP believes that where one lives as a U.S. citizen should not affect one's right to

vote.

      18.    a.    The League of Women Voters of the Virgin Islands ("LWV-VI"), founded

in 1968, is a non-profit, non-partisan political organization founded to promote political

responsibility through informed voters who actively participate in government. Its membership

includes current residents of the Virgin Islands who are former residents of Illinois and other

States. The centerpiece of the LWV-VI's activities is to expand voter participation and give a

voice to all Americans. LWV-VI is grounded in the principle that democracy should work for all

its citizens. Members of LWV-VI work to ensure that the realities of America's system of

government live up to its democratic and constitutional ideals.

           b.    LWV-VI recognizes that political empowerment of Virgin Islanders is

critical to addressing the pressing needs of the Virgin Islands community. LWV-VI believes that

continuing political disenfranchisement contributes to many hardships facing Virgin Islanders,

from economic development to healthcare to the environment. LWV-VI believes that if Virgin

Islanders who would be able to vote for President if they lived in the NMI, American Samoa, or

a foreign country could fully exercise their right to vote, it would provide new opportunities for

national political engagement on issues that affect daily life in the Virgin Islands. LWV-VI also

believes it would help create a much-needed political incentive for Congress and the President to

11

take action to ensure full voting rights for all Virgin Islanders. LWV-VI believes that where one lives as a U.S. citizen should not affect one's right to vote.

19. Defendant Board of Election Commissioners for the City of Chicago is the "election authority" that has jurisdiction over the precinct of former residence of Individual Plaintiffs Luis Segovia, Jose Antonio Torres, Pamela Lynn Colon, Tomas Ares, and Lavonne Wise, and is charged with providing absentee ballots to former Chicago residents now residing in the NMI, American Samoa, or in a foreign country. *See* 10 Ill. Comp. Stat. 5/20-2.2; *id.* 5/1-3(8); *id.* 5/6-21.

20. Defendant Langdon D. Neal is being sued in his official capacity as Chairman of the Board of Election Commissioners for the City of Chicago. In that capacity, Chairman Neal is responsible for the administration of the Board of Election Commissioners for the City of Chicago. *See* 10 Ill. Comp. Stat. 5/6-24.

21. Defendant Karen Kinney is being sued in her official capacity as the Rock Island County Clerk. The County Clerk is the "election authority" that has jurisdiction over the precinct of former residence of Individual Plaintiff Anthony Bunten, and is charged with providing absentee ballots to former Rock Island County residents now residing in the NMI or American Samoa, or in a foreign country. *See* 10 Ill. Comp. Stat. 5/20-2.2; *id.* 5/1-3(8); *id.* 5/5-4.

22. Defendant Ashton Carter is being sued in his official capacity as the Secretary of Defense. Under Executive Order Number 12,642, 53 Fed. Reg. 21,975, at 21,975 (June 8, 1988), the Secretary of Defense is "designated as the 'Presidential designee'" under UOCAVA, 52 U.S.C. § 20301(a).

23.     Defendant Federal Voting Assistance Program ("FVAP") is charged with the administration of federal responsibilities under UOCAVA pursuant to a delegation of authority by the Secretary of Defense.  *See* Department of Defense Instruction 1000.04 (Sept. 13, 2012).

24.     Defendant Matt Boehmer is being sued in his official capacity as Director of FVAP.  In that capacity, Director Boehmer is responsible for all aspects of FVAP and has the authority to administer that responsibility, including the establishment and maintenance of a voting assistance program "to assist all eligible voters as covered by" UOCAVA.  *See* Department of Defense Instruction 1000.04, at Encl. 3.

25.     Each of the above-named Defendants has been sued in its, his or her official capacity.  At all relevant times, Defendants have acted under the color of statutes, ordinances, regulations, customs and usages of the State of Illinois or the United States.

## JURISDICTION AND VENUE

26.     This action seeks declaratory relief under the Federal Declaratory Judgment Act of 1934, 28 U.S.C. §§ 2201-2202.

27.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the U.S. Constitution.  The Court also has subject matter jurisdiction under 28 U.S.C. § 1343(a)(3), because this is an action to "redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."

28.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) & (e)(1) because the United States, Ashton Carter, the Federal Voting Assistance Program, and Matt Boehmer are federal defendants and Defendants Board of Election Commissioners for the City of Chicago and

Langdon D. Neal reside in this district and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district, and because Defendant Karen Kinney and all of the non-federal defendants are residents of Illinois.

## FACTUAL ALLEGATIONS

### A.   History Of Overseas U.S. Territories

29.     The United States has five Territories: Puerto Rico, Guam, the U.S. Virgin Islands, American Samoa, and the NMI.  These jurisdictions are home to over 4 million people, a population greater than nearly half the States and larger than the five smallest States combined. According to the U.S. Census, more than 98% of the residents of these areas are racial or ethnic minorities.

30.     Puerto Rico and Guam became a part of the United States in 1898 following the Spanish-American War.  American Samoa became part of the United States after Deeds of Cession were signed in 1900 and 1904.  The U.S. Virgin Islands was purchased by the United States from Denmark in 1917.  The NMI became part of the United States in 1986.  Congress recognized people born in Puerto Rico were U.S. citizens in 1917, in the U.S. Virgin Islands in 1927, in Guam in 1950, and in the NMI in 1986; people born in American Samoa are recognized as U.S. nationals owing permanent allegiance to the United States.  While each area has a unique history and people, the Territories are similarly situated with respect to their relationship to the federal government.  While each has a local government, ultimate authority rests with Congress, which has broad power over the Territories under Article IV, Section 3 of the U.S. Constitution.

31.     The Territories have a proud tradition of military service, with their residents serving in every major American conflict since World War I.  Territorial residents volunteer to serve in the U.S. Armed Forces at rates that are generally significantly higher than the 50 States. Over 150,000 veterans currently reside in the Territories.  Nine Puerto Ricans have been awarded

14

the Medal of Honor, the highest military honor, with the Puerto Rico-based 65th Infantry having been awarded the Congressional Gold Medal, the highest civilian honor. In Iraq and Afghanistan, the casualty rates for Guam and the U.S. Virgin Islands were 4.5 times and three times the national average, respectively. American Samoa and the NMI have had similarly high casualty rates. Like other Americans, U.S. citizens who reside in the Territories are required to register for selective service when they turn eighteen. These Americans are subject to the military draft the same as other Americans, with more than 50,000 territorial residents serving in Vietnam.

32.     Residents of the Territories also contribute a significant amount to the federal treasury through federal taxes. In 2014 alone, residents of the Territories paid more than $3.5 billion in federal taxes according to the 2014 Internal Revenue Service Data Book. Territorial residents pay most federal taxes, although only certain federal employees pay federal income taxes. Territorial residents also receive most federal benefits, although many major benefits like Medicaid have funding levels capped at levels well below what residents of the States receive. A 2014 report by the Government Accountability Office examining federal taxation and benefits in Puerto Rico suggests that if residents of the Territories were treated the same as residents of the States for purposes of federal taxation and benefits, additional federal program spending would exceed new federal tax revenue.

33.     Federal criminal laws fully apply in the Territories. In 2012, the most recent year for available statistics, more than 2,100 individuals were prosecuted for federal crimes in the Territories, with more than 1,500 receiving a criminal sentence according to the Bureau of Justice Statistics Federal Justice Statistics Program. Under federal criminal law, territorial residents may face life in prison or even the death penalty, even though none of the Territories

provide for capital punishment, and several expressly prohibit it. Moreover, because of their disenfranchisement, there is no democratic accountability with respect to the federal laws they must follow, or with the federal prosecutors and federal judges who enforce the law, proceed over trials, and determine sentencing.

34.     While Congress has broad power over the Territories, their sole federal representation is a non-voting Delegate in the U.S. House of Representatives, who shares many of the privileges of other Members, but who cannot vote on final passage of legislation. The Territories lack any form of representation, voting or not, in the U.S. Senate. In presidential elections, territorial residents fully participate in the party primaries, with Delegates attending the national party conventions. But when it comes to the General Election, the Territories are not included in the Electoral College, as are residents of the States (and the District of Columbia based on the Twenty-Third Amendment).

35.     Voting trends in the Territories cross party lines. For example, while the current Puerto Rico Governor is a Democrat, its immediate past Governor is a Republican. Both Guam and the NMI currently have Republican Governors but Democratic Non-Voting Delegates to Congress. The situation is reversed in American Samoa, with a Democratic Governor and a Republican Non-Voting Delegate. The Virgin Islands has an Independent Governor (who is a former Republican), and a Democratic Non-Voting Delegate. Perhaps most striking, Guam includes a straw poll for President on its General Election ballot, with Guam voters, who cast their votes a day ahead of the rest of the country, predicting the eventual winner in every presidential election since the first straw poll in 1980.

36.     Residents of U.S. Territories are able to vote for President should they become a resident of a State or the District of Columbia. Indeed, there is a territorial diaspora of more than

16

5 million Americans living in the States and the District of Columbia who have ties to the

Territories, whether through family or having actually lived in a Territory. Included among

those in the diaspora who will have a particularly influential political voice in 2016 are the more

than 1 million who live in Florida, 423,000 in Pennsylvania, 108,000 in Ohio, 92,000 in Virginia,

and 89,000 in North Carolina. Each year, tens of thousands of territorial residents move to the

States, with the largest influx to Florida; thousands of residents of the States also move to the

Territories, where they become disenfranchised, depending on the Territory to which they move.

### B. History And Structure Of UOCAVA

37.     Congress enacted UOCAVA in 1986 to "facilitate absentee voting by United

States citizens, both military and civilian, who are overseas." H.R. Rep. No. 99-765, at 5 (1986),

reprinted in 1986 U.S.C.C.A.N. 2009, at 2009.

38.     UOCAVA built on existing federal statutes, which Congress enacted to safeguard

the fundamental nature of voting rights and to cure a potential violation of equal protection by

remedying the selective distribution of the franchise to Americans who had left their State of

residence and not adopted another state residence. *See* H.R. Rep. No. 94-649, pt. 1, at 2-3

(1975), reprinted in 1975 U.S.C.C.A.N. 2358, 2359-60.

39.     Among other things, UOCAVA was enacted to supply alternative forms of voting

to overseas citizens who seek to comply with state procedures but are unable to acquire or timely

submit state absentee ballots. H.R. Rep. No. 99-765, at 5-6, 1986 U.S.C.C.A.N. at 2009-10.

40.     Section 102 of UOCAVA (now codified as amended at 52 U.S.C. § 20302)

reaffirms the pre-existing requirement that States must "provide for absentee registration and

absentee voting by absent uniformed services voters and overseas voters." H.R. Rep. No. 99-

765, at 20, 1986 U.S.C.C.A.N. at 2024; *see also* 52 U.S.C. § 20302(a)(1) (Each State shall

"permit absent uniformed services voters and overseas voters to use absentee registration

procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office.").

41.     Section 107 of UOCAVA defines the "overseas voter[s]" covered by section 102. As amended, the provision defines "overseas voter" to include an absent uniformed services voter, "a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States," and "a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States." 52 U.S.C. § 20310(5)(B)-(C).

42.     The same section also defines "State" as "a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." *Id.* § 20310(6). Consistent with this definition, it also provides that the term "'United States,' where used in the territorial sense, means" the same grouping of States and Territories. *Id.* § 20310(8).

43.     The NMI is excluded from both definitions. No explanation is given for this arrangement in the legislative history.

44.     The effect of UOCAVA's statutory language is to protect the right to vote for President and voting representation in the U.S. House and Senate for *certain* U.S. citizens who move outside the States, *but not for others*, drawing lines even between U.S. citizens based on the *particular* overseas Territory in which they reside.

C.     **History And Structure Of The Illinois Overseas Voting Statute**

45.     Illinois has adopted its own provision, known as Illinois MOVE, protecting and regulating the voting rights of overseas citizens. Illinois MOVE provides that U.S. citizens indefinitely residing "outside the territorial limits of the United States" can vote by absentee

ballot as Illinois residents in federal elections for President and the U.S. House and Senate. 10 Ill. Comp. Stat. 5/20-1(4); *id*. at 5/20-2.2.

46.     The Illinois statute defines the "territorial limits of the United States" as a U.S. state, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands. *Id.* 5/20-1(1). As with UOCAVA, it excludes the NMI from the definition. But it goes further, expressly excluding American Samoa from the definition as well. *Id.*

47.     Thus, under Illinois law, former Illinois residents living in a foreign country, or in American Samoa or the NMI – but not other U.S. Territories overseas – may vote in Illinois by absentee ballot for President and voting representation in the U.S. House and Senate.

### D.     <u>Equal Protection Principles</u>

48.     The Equal Protection Clause of the U.S. Constitution provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

49.     Equal-protection requirements apply both to federal and state laws. *See, e.g.*, *United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws.").

50.     The Equal Protection Clause guarantees a citizen's "right to participate in elections on an equal basis" when that right is threatened by "statutes that selectively distribute the franchise." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with" equal protection. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966). This constitutional principle is necessary to safeguard voters' ability to protect their stake in the affairs of government "by exercising the equal right to vote." *Evans v. Cornman*, 398 U.S. 419, 426 (1970).

51.     Federal and Illinois law protect the right to vote for *certain* U.S. citizens who move overseas, while denying it to others who are similarly situated, even going so far as to draw lines based on the *particular* Territory in which a person resides.  Neither Congress nor Illinois has offered any justification for this arbitrary classification.

### CLAIM FOR RELIEF

**UOCAVA And The Illinois Statute Violate The Equal-Protection And Due Process Guarantees Under The Fifth And Fourteenth Amendments And 42 U.S.C. § 1983 By Treating Differently Former State Residents Depending On Where They Now Reside Outside The States**

Plaintiffs incorporate by reference paragraphs 1 through 51 as if set forth here in full.

52.     By treating similarly situated former state residents differently based on where they reside overseas, UOCAVA and Illinois MOVE violate the equal-protection and due process guarantees of the Fifth and Fourteenth Amendments and 42 U.S.C § 1983.  The two statutes protect the voting rights of *certain* U.S. citizens who live outside the States in *certain* overseas Territories or foreign countries, while denying those rights to similarly situated U.S. citizens who live in *other* overseas Territories.

53.     No legislature has articulated a legitimate justification for this arbitrary and disparate treatment of overseas citizens.  Even if some justification had been offered for such disparate treatment, it could not pass constitutional muster under *any* standard of review.

54.     By reason of the foregoing, Defendants, acting under color of federal and state law, have deprived and will continue to deprive Plaintiffs of equal protection under the law secured to them by the Fourteenth Amendment and the Fifth Amendment, and protected against state interference specifically by 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request of this Court the following equitable relief:

a. An order declaring that 52 U.S.C. § 20310 and 10 Ill. Comp. Stat. 5/20-1 of the Illinois Compiled Statutes violate the Fifth Amendment, the Fourteenth Amendment, and 42 U.S.C § 1983 by defining "United States" and "territorial limits of the United States" in a manner that discriminates among former Illinois residents living overseas outside the States;

b. A preliminary and permanent order enjoining Defendants, their respective agents, servants, employees, attorneys, successors, and all persons acting in concert with each or any of them, to accept applications to vote absentee in the next federal election in Illinois from Individual Plaintiffs.

c. Attorneys' fees and costs to which Plaintiffs might be entitled by law; and

d. Such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

*s/ Charles F. Smith*
Charles F. Smith
Lara A. Flath
155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 407-0700
charles.smith@probonolaw.com
lara.flath@probonolaw.com

Geoffrey M. Wyatt
Michael McIntosh
Marisa B. Van Saanen
W. Graham McCall
1440 New York Avenue N.W.
Washington, D.C. 20005
(202) 371-7000
geoffrey.wyatt@probonolaw.com
(applications for admission *pro hac vice* forthcoming)

Neil C. Weare
We the People Project
1666 Connecticut Avenue N.W.
Suite 500
Washington, DC 20009
(202) 304-1202
nweare@equalrightsnow.org
(application for admission *pro hac
vice* forthcoming)

Leevin T. Camacho
The Law Office of Leevin T.
   Camacho
194 Hernan Cortez Avenue
Suite 216
Hagåtña, Guam 96910
(617) 477-8894
leevin@guahanlaw.com
(application for admission *pro hac
vice* forthcoming)

Luis G. Rivera Marín
Rivera Marín & Talavera Law
   Offices
112 Uruguay Street
Hato Rey, Puerto Rico 00918
(787) 946-9400
luisg@riveramarin.com
(application for admission *pro hac
vice* forthcoming)

Semaj Johnson
Law Offices of K.A. Rames PC
Suite 3, 2111 Company Street
Christiansted, St. Croix, Virgin
   Islands 00820
(340) 773-7284
semaj.johnson@rameslaw.com
(application for admission *pro hac
vice* forthcoming)

*Attorneys for Plaintiffs*