**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LUIS SEGOVIA, JOSE ANTONIO TORRES, PAMELA LYNN COLON, TOMAS ARES, ANTHONY BUNTEN, LAVONNE WISE, IRAQ AFGHANISTAN AND PERSIAN GULF VETERANS OF THE PACIFIC, and LEAGUE OF WOMEN VOTERS OF THE VIRGIN ISLANDS,** | ) ) ) ) ) ) ) ) ) | **Case No. 15 C 10196** <br><br> **Judge Joan B. Gottschall** |
| Plaintiffs, | ) ) | |
| **v.** | ) ) | |
| **BOARD OF ELECTION COMMISSIONERS FOR THE CITY OF CHICAGO, KAREN KINNEY, UNITED STATES OF AMERICA, ASHTON CARTER, FEDERAL VOTING ASSISTANCE PROGRAM, MATT BOEHMER, AND MARISEL HERNANDEZ,** | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

As Franklin D. Roosevelt famously said in a 1944 radio address from the White House,

"Nobody will ever deprive the American people of the right to vote except the American people

themselves and the only way they could do this is by not voting." This statement assumes that all

United States citizens can vote if they choose to do so. As this case shows, that assumption is

incorrect. The plaintiffs in this action are six United States citizens who are former residents of

Illinois and who now reside in Puerto Rico, Guam, or the U.S. Virgin Islands, plus two

organizations that promote voting rights in United States Territories. The plaintiffs challenge the

constitutionality of the Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C.

§ 20310 ("UOCAVA"), contending that it violates their equal protection and due process rights

by barring them from casting absentee ballots in Illinois for federal elections due to their residence in the United States Territories of Puerto Rico, Guam, or the U.S. Virgin Islands, while allowing United States citizens who were previously qualified to vote in Illinois and currently reside in the United States Territory of the Northern Mariana Islands ("NMI") or in a foreign country to cast absentee Illinois ballots.[1]

The federal defendants (the United States of America, the Federal Voting Assistance Program, Ashton Carter, in his official capacity as the Secretary of Defense, and Matt Boehmer, in his official capacity as Director of the Federal Voting Assistance Program) filed a motion to dismiss and a motion for summary judgment.[2] The plaintiffs filed a cross-motion for summary judgment directed at their claims against the federal defendants. As discussed below, the plaintiffs have standing to challenge the constitutionality of the UOCAVA, the proper standard of review is rational basis, as opposed to strict scrutiny, and under the rational basis standard, the challenged provisions of the UOCAVA are constitutional.

---

[1] The plaintiffs raise a similar challenge to the Illinois Military and Overseas Voter Empowerment Act ("Illinois MOVE"), 10 Ill. Comp. Stat. § 5/20-1, which allows voters who were formerly qualified to vote in federal elections in Illinois and who now reside in the United States Territory of American Samoa to vote in federal elections via Illinois absentee ballot. As the motions presently before the court all concern the UOCAVA, the court will not address the plaintiffs' arguments about Illinois MOVE at this time.

[2] The remaining defendants—the Board of Election Commissioners for the City of Chicago, Marisel Hernandez (the Chairman of the Board of Election Commissioners for the City of Chicago), and Karen Kinney (the Rock Island County Clerk) have answered.

# I. BACKGROUND[3]

## A.    The Parties

The individual plaintiffs (Luis Segovia, Jose Antonio Torres, Pamela Lynn Colon, Tomas Ares, Anthony Bunten, and Lavonne Wise) are United States citizens and former Illinois residents.  Before moving from Illinois, the plaintiffs voted in federal elections administered by Illinois.  Currently, Mr. Segovia and Mr. Bunten reside in Guam, Mr. Torres and Mr. Ares reside in Puerto Rico, and Ms. Colon and Ms. Wise reside in the U.S. Virgin Islands, all of which are United States Territories.

The individual plaintiffs all have distinguished careers serving the United States in the armed forces and/or as public servants.  Because they reside in Puerto Rico, Guam, or the U.S. Virgin Islands, they cannot vote in federal elections via Illinois absentee ballot.  In contrast, former Illinois residents who were qualified to vote in federal elections while living in Illinois can cast Illinois absentee ballots in federal elections if they reside in the NMI (pursuant to the UOCAVA), American Samoa (pursuant to Illinois MOVE), or a foreign country.

---

[3] The following facts are drawn from the parties' Local Rule 56.1 submissions.  The plaintiffs and the federal defendants failed to reproduce the opposing side's statements of fact when preparing their responses.  *See* Loc. R. 56(b)(3)(a).  In addition, the parties' summary chart, which was submitted at the court's request due to the unusual combined documents filed by both sides, does not include any of the Local Rule 56.1 submissions or anything filed after April 26, 2016.  (Dkt. 57.)  It thus is of limited utility, especially since the federal defendants filed their Local Rule 56.1 submissions as attachments to their combined memorandum in support of their summary judgment/opposition to the plaintiffs' cross-motion for summary judgment/reply in support of their motion to dismiss.  For the reader's convenience, the statements of facts filed by the plaintiffs and the federal defendants are Dkt. 49 and Dkt. 51-4, respectively.  The plaintiffs' response to the federal defendants' facts is Dkt. 59 and the federal defendants' response to the plaintiffs' facts is Dkt. 51-5.

## 1. Plaintiffs Currently Residing in Puerto Rico

Plaintiff Jose Antonio Torres is a United States citizen born in 1955 in Ponce, Puerto Rico, who currently resides in Carolina, Puerto Rico. Mr. Torres is a Vietnam-era Veteran who has a combined 100% disability rating by virtue of injuries sustained during his military service. He was recruited to join the United States Army as a high school student in Ponce, Puerto Rico. In 1973, he was stationed in Germany as part of the 141st Field Artillery, a posting that required top secret clearance. He was honorably discharged in 1975 due to severe injuries he sustained in Germany.

Mr. Torres resided in Chicago from 1982 to 1993. He began working for the United States Postal Service in 1986. He was transferred from Illinois to Puerto Rico in 1993, where he continued to work for the Postal Service for another fifteen years until he retired in 2008 after 22 years of federal service. As a federal employee in Puerto Rico, Mr. Torres was required to pay the same federal taxes, including federal income tax, as federal employees living on the mainland. When Mr. Torres resided in Illinois, he voted for President; he now votes in Puerto Rico elections.

Plaintiff Tomas Ares is a United States citizen born in San Lorenzo, Puerto Rico in 1955, where he currently resides. From 1967 to 2007, he resided in Chicago, Illinois. He then retired and moved to Puerto Rico. He is a Vietnam-era Veteran who joined the U.S. Army in 1971 at the age of 17, following the footsteps of his father, who was born in Puerto Rico in 1902 and served in the U.S. Army's 65th Infantry from 1920 through 1944. After Mr. Ares was stationed in Germany, he was honorably discharged in 1972 because he was not of the legal age to serve. When Mr. Ares resided in Illinois, he voted for President; he now votes in Puerto Rico elections.

### 2. Plaintiffs Currently Residing in Guam

Plaintiff Luis Segovia is a United States citizen born in Chicago, Illinois, in 1978. He moved from Chicago to Guam in 2010 and is a decorated veteran. He served in the U.S. Army in Iraq from 2005 to 2006, where his primary mission was to provide security for the 2005 Iraqi elections. He then served in the Illinois National Guard, where he was deployed to Afghanistan from 2008 to 2009. He joined the Guam National Guard in 2010 after becoming a resident of Guam, and was deployed for a ten-month second tour of duty in Afghanistan. He was recently promoted to the rank of Staff Sergeant, and also serves his country as a federal employee with the Department of the Navy's civilian security forces police assigned to Anderson Air Force Base in Guam. When Mr. Segovia resided in Illinois, he voted for President; he now votes in Guam elections.

Plaintiff Anthony Bunten is a United States citizen born in Moline, Illinois in 1976. Mr. Bunten is a Veteran who joined the U.S. Navy directly out of high school in 1994. He was honorably discharged in 1997, when he moved to Guam to join his now-wife, Barbara Perez Hattori. When Mr. Bunten resided in Illinois, he voted for President; he now votes in Guam elections.

### 3. Plaintiffs Currently Residing in the U.S. Virgin Islands

Plaintiff Pamela Lynn Colon is a United States citizen born in Chicago, Illinois, in 1959. She lived in Chicago until 1992, when she moved to the U.S. Virgin Islands, and currently resides in St. Croix. From 1996 to 2000, Ms. Colon served as the Assistant Federal Public Defender in St. Thomas in the U.S. Virgin Islands. She has defended numerous clients in the U.S. Virgin Islands who were federally prosecuted, including several who faced the possibility of

life in prison or the death penalty. She is the past-President of the Virgin Islands Bar Association. When Ms. Colon resided in Illinois, she voted for President; she now votes in elections in the U.S. Virgin Islands.

Plaintiff Lavonne Wise is a United States citizen born in Queens, New York; she currently resides in St. Croix in the U.S. Virgin Islands. From 2003 to 2009, she resided in Chicago, Illinois. As a resident of Chicago in 2008, Ms. Wise voted for President by absentee ballot while temporarily working in St. Croix, but after she became a resident of St. Croix in 2009, she became unable to vote for President. She now regularly votes in elections in the U.S. Virgin Islands. Previously, from 1990-1992, Ms. Wise moved from Atlanta, Georgia, to St. Maarten, Netherland Antilles. While living in St. Maarten, Ms. Wise was able to vote for President via absentee ballot.

### 4. Organizational Plaintiffs

The remaining plaintiffs are the Iraq Afghanistan and Persian Gulf Veterans of the Pacific ("IAPGVP") and the League of Women Voters of the Virgin Islands ("LWV-VI"). IAPGVP is a nonprofit organization founded in 2014 whose mission is to provide opportunities to engage, enrich, and empower Pacific Island veterans of Iraq, Afghanistan, and the Persian Gulf and their families. While up to one in eight adults in Guam is a veteran and the casualty rate for Guam soldiers in Iraq and Afghanistan has been up to 4.5 times the national average, in 2012, Guam ranked below every State in medical-care spending per veteran. IAPGVP's position is that political disenfranchisement contributes to the healthcare crisis facing Guam veterans. LWV-VI was founded in 1968 and is a non-profit, non-partisan political organization. Its main goal is to give a voice to all Americans by expanding voter participation. LWV-VI's position is that

continuing political disenfranchisement contributes to many hardships facing Virgin Islanders, including economic development, healthcare, and the environment.

The plaintiffs allege that unspecified former Illinois residents are members of both organizational plaintiffs. IAPGVP and LWV-VI posit that allowing United States citizens who live in their respective territories to vote would provide new opportunities for national political engagement about issues in Guam and the Virgin Islands. All of the plaintiffs allege that they believe that where one lives as a United States citizen should not affect the right to vote.

### 5.    The Defendants

The state defendants are the Board of Election Commissioners for the City of Chicago, Marisel Hernandez (the Chair of the Board of Election Commissioners), and Karen Kinney (the Rock Island County Clerk). The Board of Election Commissioners is the election authority with jurisdiction over the precincts where Mr. Segovia, Mr. Torres, Ms. Colon, Mr. Ares, and Ms. Wise resided before they moved from Illinois. The Rock Island County Clerk is the election authority with jurisdiction over the precinct where Mr. Bunten resided before he moved from Illinois. The Board of Election Commissioners, Ms. Hernandez, and Ms. Kinney agree that individuals who were eligible to vote in federal elections when they resided in Illinois and who now reside overseas in Puerto Rico, Guam, or the U.S. Virgin Islands are ineligible to vote absentee in Illinois, but would be eligible if they resided in the NMI, American Samoa, or a foreign country. The federal defendants are the United States of America, Secretary of Defense Ashton Carter, the Federal Voting Assistance Program, and Director of the Federal Voting Assistance Program Matt Boehmer. All of the individual defendants have been sued in their official capacities.

**B.     The UOCAVA and Illinois' MOVE Act**

The UOCAVA imposes a range of responsibilities on states (here, Illinois, as the individual plaintiffs wish to vote by Illinois absentee ballot) relating to absentee voting in federal elections by uniformed service members or overseas voters, as those terms are defined in the UOCAVA.  52 U.S.C. § 20302.

- The UOCAVA defines "[f]ederal office" as "the office of President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress."  52 U.S.C. § 20310(3).

- "'State' means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa." 52 U.S.C. § 20310(6).

- "'United States,' where used in the territorial sense, means the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa."  52 U.S.C. § 20310(8).

- An "overseas voter" is: "(A) an absent uniformed services voter [serving in the Army, Navy, Air Force, Marine Corps, and Coast Guard, the commissioned corps of the Public Health Service, or the commissioned corps of the National Oceanic and Atmospheric Administration] who, by reason of active duty or service is absent from the United States on the date of the election involved;  (B) a person who resides outside the United States and is qualified to vote in the last place in which the person was domiciled before leaving the United States; or (C) a person who resides outside the United States and (but for such residence) would be qualified to vote in the last place in which the person was domiciled before leaving the United States."[4]  52 U.S.C. § 20310(5) & (7).

Because the individual plaintiffs currently are domiciled in Puerto Rico, Guam, and the U.S. Virgin Islands, they fall within the UOCAVA's definition of "State" and thus do not "reside[] outside the United States" for the purposes of the UOCAVA.  *See* 52 U.S.C. § 20310(6)

---

[4]  The UOCAVA thus creates a seemingly anomalous situation:  a member of the armed forces stationed on, for example, Guam, who was previously qualified to vote in Illinois can vote in federal elections via an Illinois absentee ballot.  If that person retires from service and stays in Guam, however, she loses her ability to vote via Illinois absentee ballot.

& (8).  Thus, the individual plaintiffs are not "overseas voters" as that term is defined in the

UOCAVA.  52 U.S.C. § 20310(5) & (7).  This means that their state of former residence where

they were eligible to vote in federal elections (here, Illinois) is not required to provide absentee

ballots that would allow the individual plaintiffs to vote in federal elections.

Under the UOCAVA, United States citizens who were formerly eligible to vote in federal

elections in Illinois and who now live in American Samoa also cannot vote via Illinois absentee

ballot, as American Samoa—like Puerto Rico, Guam, and the U.S. Virgin Islands—falls within

the UOCAVA's definition of "State."  *See* 52 U.S.C § 20310(6).  However, Illinois has extended

absentee voting rights to include former Illinois residents who currently reside in American

Samoa and are otherwise eligible to vote.[5]  *See* 10 Ill. Comp. Stat. § 5/20-1(1) ("'Territorial

limits of the United States' means each of the several States of the United States and includes the

District of Columbia, the Commonwealth of Puerto Rico, Guam and the Virgin Islands; but does

not include American Samoa, the Canal Zone, the Trust Territory of the Pacific Islands or any

other territory or possession of the United States").[6]

---

[5]  Illinois MOVE, like the UOCAVA, does not allow United States citizens who were
eligible to vote in Illinois to vote via absentee ballot after they move to Puerto Rico, Guam, and
the U.S. Virgin Islands.  *See* 10 Ill. Comp. Stat. § 5/20-1(1).  However, it allows otherwise
similarly situated individuals to vote via absentee ballot if they move to American Samoa.  *Id*.
Presumably, this will be the subject of a second round of dispositive motions.

[6]  The Trust Territory of the Pacific Islands is a former United Nations strategic
trusteeship that was administered by the United States.  It consisted of the Federated States of
Micronesia, the Republic of the Marshall Islands, the NMI, and Palau.  *See* http://www.un.org/
en/ decolonization/selfdet.shtml; *see also Davis v. Commonwealth Election Comm'n*, No.
1-14-CV-00002, 2014 WL 2111065, at *1 (D. N. Mar. I. May 20, 2014) (the Trust Territory of
the Pacific Islands consists of "the islands that later formed the Commonwealth, the republics of
Palau and the Marshall Islands, and the Federated States of Micronesia.  One of the purposes of
the trusteeship was for the United States to promote independence and self-government among
the peoples of those islands.").

In 2009, Congress passed the Military and Overseas Voter Empowerment Act, which amended the UOCAVA.  *See United States v. Georgia*, 778 F.3d 1202, 1203 (11th Cir. 2015). As amended, the UOCAVA requires states, upon request, to send an absentee ballot to absent uniformed service voters and overseas voters at least 45 days before an election for Federal office, unless the state provides a hardship waiver.  *Id*.

### III.  THRESHOLD ISSUES:  JURISDICTION AND STANDING

The federal defendants raise three threshold arguments:  (1) this court lacks subject matter jurisdiction to adjudicate the plaintiffs' challenge to the UOCAVA, (2) the organizational plaintiffs lack standing because they have not identified specific former Illinois residents who are members, and (3) the individual plaintiffs lack standing because their alleged injuries are not fairly traceable to the UOCAVA.

### A.      Federal Question Jurisdiction

The court must "consider subject-matter jurisdiction as the first question in every case" and "must dismiss . . . if such jurisdiction is lacking."  *Aljabri v. Holder*, 745 F.3d 816, 818 (7th Cir. 2014) (citations omitted).  Here, the federal defendants challenge subject matter jurisdiction, arguing that the plaintiffs lack standing to bring claims against them.  "Subject-matter jurisdiction . . . refers to a tribunal's power to hear a case."  *Morrison v. Nat'l Australia Bank, Ltd.*, 561 U.S. 247, 254 (2010).  "[A]n issue of statutory standing . . . . has nothing to do with whether there is a case or controversy under Article III."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998).  Given the federal constitutional questions at issue, subject matter jurisdiction is unquestionably proper, despite the federal defendants' standing arguments.  *See* 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1343 ("The district courts shall have

original jurisdiction of any civil action authorized by law to be commenced by any person . . .

[t]o recover damages or to secure equitable or other relief under any Act of Congress providing

for the protection of civil rights, including the right to vote").

**B.      Standing**

Standing is "an essential and unchanging part of the case-or-controversy requirement of

Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

(1992). To establish standing, a plaintiff must prove that: (1) she suffered a concrete and

particularized injury that is actual or imminent; (2) the injury is fairly traceable to the defendant's

actions; and (3) it is likely that the injury will be redressed by a favorable decision. *Id*. When

evaluating standing, the court accepts the material allegations of the complaint as true and

construes the complaint in the plaintiffs' favor. *Davis v. Guam*, 785 F.3d 1311, 1314 (9th Cir.

2015) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

**1.      Organizational Plaintiffs**

The federal defendants challenge the organizational plaintiffs' standing based on the fact

that the complaint does not name any members of either organization who were eligible to vote

in federal elections when they resided in Illinois. Thus, the federal defendants assert that the

organizational plaintiffs have failed to show that they suffered an cognizable injury. "Where at

least one plaintiff has standing [for a particular claim], jurisdiction is secure and the court will

adjudicate the case whether the additional plaintiffs have standing or not." *Ezell v. City of*

*Chicago*, 651 F.3d 684, 696 n.7 (7th Cir. 2011); *see also Tuaua v. United States*, 951 F. Supp. 2d

88, 92-93 (D.D.C. 2013), *aff'd*, 788 F.3d 300 (D.C. Cir. 2015) (holding that it was unnecessary to

address whether the Samoan Federation of America had standing to pursue a citizenship

challenge on behalf of individuals born in American Samoa because it was undisputed that other plaintiffs had standing). The federal defendants do not and cannot question the individual plaintiffs' contention that they have each suffered a concrete and particularized injury due to their inability to vote in federal elections via Illinois absentee ballot. Thus, the court need not delve into the organizational plaintiffs' membership to determine if those plaintiffs also suffered an injury. The federal defendants' arguments about the organizational plaintiffs' standing are unavailing.

### 2.      Standing—Traceability

Next, the federal defendants argue that the plaintiffs lack standing to sue them (as opposed to the state defendants based on Illinois MOVE) because the plaintiffs' alleged injuries are not fairly traceable to the UOCAVA. Specifically, the federal defendants assert that the UOCAVA does not impose the voting disability of which plaintiffs complain; rather, according to the federal defendants, that restriction results from requirements imposed by Illinois law, as well as provisions of the Constitution, which delegate the authority to regulate voting in federal elections to the states.

The federal defendants expressly state that their standing argument is based on traceability.[7] The causation element of Article III standing requires the plaintiffs' injury to be

---

[7] Another court faced with a similar argument analyzed it under the injury-in-fact element of standing. *See Igartua v. United States*, 86 F. Supp. 3d 50, 55 (D.P.R. 2015). (There are numerous cases captioned *Igartua*, as that plaintiff filed a series of cases addressing voting rights of United States citizens in Puerto Rico. The court will follow the parties' numbering convention in this opinion, but they do not cite to this particular *Igartua* case so it lacks a number). Specifically, that court held that a claim that the UOCAVA was responsible for the inability of United States citizens living in Puerto Rico to vote for representatives from Puerto Rico to the United States House of Representatives did not rise to the level of an "invasion of a legally protected interest" because the UOCAVA did not cause the plaintiffs' injury. *Id.* (quoting

"fairly traceable" to the defendants' actions. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014). To satisfy this standard, a plaintiff's injury and a defendant's conduct must be causally connected. *Id.*; *see also Indiana v. E.P.A.*, 796 F.3d 803, 809 (7th Cir. 2015) (quoting *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (traceability exists when a plaintiff sustains an injury "'as a consequence of' the challenged conduct")). "If the independent action of some third party not before the court causes [the plaintiff's harm]," she cannot show traceability. *Sierra Club v. Franklin Cnty. Power of Illinois, LLC*, 546 F.3d 918, 926 (7th Cir. 2008) (internal quotations omitted). Without traceability, a plaintiff lacks standing. *See*, *e.g.*, *Cnty. of Cook v. HSBC N. Am. Holdings Inc.*, 136 F. Supp. 3d 952, 959-60 (N.D. Ill. 2015).

The Constitution contains "no reference to the election of the President, which is by the electoral college rather than by the voters at the general election; general elections for President were not contemplated in 1787." *ACORN v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995). Thus, the Constitution does not give individual citizens a direct right to vote for President and Vice President. *See id.* Instead, the Constitution gives this right to "Electors" appointed by "[e]ach State." U.S. Const. art. II, § 2; *see also id.* at amend. XII ("Election of President and Vice-President"). However, the Supreme Court has held that "[h]istory has now favored the voter, and in each of the several States the citizens themselves vote for Presidential electors." *Bush v. Gore*, 531 U.S. 98, 104 (2000). With respect to the House of Representatives, the "People of the

_____

*Lujan*, 504 U.S. at 560). This is, essentially, the federal defendants' standing argument in this case. Whether their argument is characterized as an alleged lack of injury-in-fact or traceability, the result appears to be the same. In addition, the federal defendants do not rely on the purported lack of an injury-in-fact. Thus, the court will not consider injury-in-fact.

Several States" can choose the members. *Id*. at art. I, § 2, cl. 1-4. In turn, "[t]he Senate of the United States shall be composed of two Senators from each state, elected by the people thereof . . . . " U.S. Const. amend. XVII.

The Constitution gives broad authority to states to regulate both state and federal elections. *See* U.S. Const. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators."). Article II section 1 provides that "Congress may determine the Time of chusing the Electors [for President], and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." *ACORN*, 56 F.3d at 793. "This provision has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections." *Id*. (citing *Burroughs v. United States*, 290 U.S. 534 (1934)).

The federal defendants argue that in enacting the UOCAVA, "Congress contemplated that States, which have the constitutional authority and duty to prescribe the time, place, and manner of voting in federal elections in the first instance, would extend absentee voting rights as they deemed appropriate." (Dkt. 51 at 4-5.) In support, the federal defendants contend that UOCAVA's legislative history makes clear that a state can adopt voting practices which are less restrictive than the practices prescribed by the UOCAVA. *See* H.R. Rep. No. 99-765, at 19 (1986), reprinted in 1986 U.S.C.C.A.N. 2009, 2023. They note that Illinois has done so by extending absentee voting rights in federal elections to individuals who were eligible to vote when they resided in Illinois and then moved to American Samoa. *See* 10 Ill. Comp. Stat.

§ 5/20-1(1).  Thus, they conclude that Illinois MOVE—not UOCAVA—bars the individual

plaintiffs from voting absentee in Illinois, because Illinois chose to extend the franchise to

qualified voters who move from Illinois to American Samoa, but did not include similarly

situated people who move to Puerto Rico, Guam, or the U.S. Virgin Islands.  In other words, they

characterize the UOCAVA as a floor upon which states may build, as opposed to an independent

cause of the plaintiffs' claimed injuries.

The federal defendants' argument that UOCAVA provides a floor and does not prevent

Illinois from giving former Illinois residents in Puerto Rico, Guam, or the U.S. Virgin Islands the

right to vote in federal elections is besides the point.  It is true that states are responsible for

ensuring compliance with the UOCAVA.  *See United States v. Alabama*, 857 F. Supp. 2d 1236,

1239 (M.D. Ala. 2012) ("Alabama bears full responsibility for compliance with UOCAVA").

The parties also agree that states, such as Illinois, not the federal government, control how federal

elections are conducted.  However, the federal defendants have not identified any authority that

demonstrates that Illinois' failure to extend voting rights insulates them from a constitutional

challenge to the UOCAVA's scope or that Illinois' control over aspects of the methodology of

the mechanics of voting and Illinois' ability to expand who may vote means that the plaintiffs fail

to satisfy the traceability element of standing.

Indeed, the UOCAVA includes multiple provisions that require states to "extend

additional protections to the UOCAVA absentee voting process that they might not extend to

other absentee voters as a matter of state law."  *Alabama*, 778 F.3d at 929.  For example, states

must accept UOCAVA registration forms and ballot requests received at least thirty days before

any election.  52 U.S.C. § 20302(a)(2).  States must allow UOCAVA voters to use federal

write-in ballots. 52 U.S.C.§ 20302(a)(3). And states cannot enforce requirements regarding notarization, paper type, or envelope type. 52 U.S.C. 20302(i). The presence of these provisions, as well as the bedrock voting rights for certain overseas voters in the UOCAVA, show that the statute—consistent with the Constitution's provisions about voting in federal elections—requires states to confer certain benefits on certain voters.

At least one court has held that in the context of a constitutional challenge to the UOCAVA, Article II of the Constitution specifies that "only citizens residing in states can vote for electors and thereby indirectly for the President." *Igartua De La Rosa v. United States* (*Igartua I*), 32 F.3d 8, 9-10 (1st Cir. 1994) (applying this rule to putative federal voters who are United States citizens and reside in Puerto Rico); *see also Attorney General of Guam on behalf of All U.S. Citizens Residing in Guam, etc. v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984) (applying this rule to putative federal voters who are United States citizens and reside in Guam); *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (applying this rule to putative federal voters who are United States citizens and reside in the U.S. Virgin Islands). *Igartua I*, however, does not stand for the proposition that plaintiffs mounting a challenge to the UOCAVA lacked standing to do so based on traceability. Indeed, that court reached the merits of the plaintiffs' claims and held that under a rational basis standard, UOCAVA's failure to extend the franchise to the plaintiffs was constitutional. *Igartua I*, 32 F.3d at 11 ("While the Act does not guarantee that a citizen moving to Puerto Rico will be eligible to vote in a presidential election, this limitation is not a consequence of the Act but of the constitutional requirements discussed above."). Thus, *Igartua I* and the federal defendants' characterization of UOCAVA as a mere floor does not establish that the plaintiffs' claimed injuries are divorced from the UOCAVA.

The fact that state law governs the mechanism by which former Illinois residents who are United States citizens can cast absentee ballots and that UOCAVA's legislative history indicates that states may extend absentee voting rights to other individuals disenfranchised by the UOCAVA, such as residents of American Samoa, also fails to show that the plaintiffs lack standing to challenge the UOCAVA. *See* H.R. Rep. No. 99-765, at 19. As discussed above, the UOCAVA includes Puerto Rico, Guam, the U.S. Virgin Islands, and American Samoa in its definition of state. Illinois MOVE, however, carves out American Samoa. *See* 10 Ill. Comp. Stat. § 5/20-1(1). Thus, an individual who was qualified to vote in a federal election in Illinois can continue to vote in federal elections via an Illinois absentee ballot if she moves to American Samoa, but not if she moves to Puerto Rico, Guam, or the U.S. Virgin Islands.

The federal defendants attempt, without the benefit of authority, to blame Illinois for this situation. However, they are responsible for the terms of the UOCAVA, not Illinois. Illinois' ability to provide redress does not insulate the federal defendants from liability. Relatedly, while the federal defendants have no role in accepting or rejecting Illinois absentee ballots, Illinois is bound by the floor that the federal defendants stress that the UOCAVA provides. If the UOCAVA's definition of "state" excluded Puerto Rico, Guam, and the U.S. Virgin Islands, the individual plaintiffs would be qualified "overseas voters" under the UOCAVA. In that instance, Illinois would have to allow the individual plaintiffs to cast Illinois absentee ballots in federal elections.

For all of these reasons, the federal defendants' claim that Illinois has the ability to broaden the right to vote by absentee ballot to individuals who do not satisfy the UOCAVA does not absolve them from potential liability under UOCAVA; at best, Congress has itself acted in a

-17-

specific way and authorized the states to enact their own more expansive laws if they choose to do so. The court fails to see how this destroys the plaintiffs' standing to proceed with equal protection and due process challenges to the UOCAVA against the federal defendants. The federal defendants' request to dismiss the plaintiffs' claims against them or grant summary judgment based on standing is denied.

## IV. THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

As is relevant here, the plaintiffs contend that the UOCAVA treats United States citizens who are former Illinois residents who were qualified to vote in federal elections and who now reside in United States Territories differently based on the territory in which they live and thus violates their right to equal protection.[8] The parties dispute the applicable standard of review: the plaintiffs champion strict scrutiny based on their position that the UOCAVA infringes on

---

[8] In their complaint, the plaintiffs allege that the UOCAVA and Illinois MOVE violate the equal protection and due process guarantees in the Fifth and Fourteenth Amendments. (Dkt. 1 at ¶ 52.) The plaintiffs' memorandum in support of their motion for summary judgment (which they combine with their response to the federal defendants' motion to dismiss), however, refers only to equal protection. In turn, the federal defendants' filings refer generally to both equal protection and due process. The gravamen of the plaintiffs' complaint is that UOCAVA and Illinois MOVE treat "similarly situated former state residents differently based on where they reside overseas." (Dkt. 1 at ¶ 52.) Thus, the plaintiffs' due process claim appears to be an equal protection claim recast in due process terms. "[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *See County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). The parties' briefs do not address the viability of a standalone due process claim against the federal defendants. As the court lacks the benefit of the parties' views and the plaintiffs' complaint focuses on equal protection, the court will likewise focus on the plaintiffs' equal protection claim against the federal defendants at this point in the proceedings. The court also expressly declines to consider the plaintiffs' arguments about the constitutionality of Illinois MOVE at this time, as they are not properly before the court in connection with motions directed at the federal defendants based on the UOCAVA.

their fundamental right to vote.[9]  In contrast, the federal defendants contend that the court should

consider whether the UOCAVA's treatment of certain overseas voters has a rational basis.  The

parties also dispute whether, under their desired standard of review, the challenged portions of

UOCAVA are constitutional.  As discussed below, rational basis review applies and the

challenged portions of the UOCAVA satisfy that undemanding standard.

        This conclusion does not reflect the court's view that the current scheme is desirable or

proper.  *See generally Igartua v. United States*, 626 F.3d 592, 594 (1st Cir. 2010) (holding that

"the U.S. Constitution does not give Puerto Rico residents the right to vote for members of the

_____

        [9]  Strict scrutiny also applies to laws that draw distinctions based on suspect categories
such as race, religion, and national origin.  *See, e.g.*, *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943
(7th Cir. 2009).  The plaintiffs, who now reside in Puerto Rico, Guam, and the U.S. Virgin
Islands, base their contention that strict scrutiny applies on what they characterize as their
fundamental right to vote in federal elections via Illinois absentee ballot, since they were
qualified to vote in federal elections when they lived in Illinois.  Thus, the court will similarly
confine its consideration.  However, it notes that the status of unincorporated territories is based,
in significant part, on the so-called *Insular Cases*, which state that the United States' possessions
are "inhabited by alien races, differing from us in religion, customs, laws, methods of taxation,
and modes of thought."  *Downes v. Bidwell*, 182 U.S. 244, 287 (1901).  "It could be argued that
because a large segment of the population of the territories is Latino, black, or of Pacific Islander
or Asian extraction, the exclusion of U.S. citizens residing in the territories from the vote for
electors to the electoral college therefore has a disproportionately discriminatory effect."  *Romeu
v. Cohen*, 265 F.3d 118, 133 (2d Cir. 2001) (Walker, C.J. concurring).  This is consistent with the
description of the *Insular Cases* as establishing a race-based doctrine of "separate and unequal"
status for residents of overseas United States Territories.  *See Paeste v. Gov't of Guam*, 798 F.3d
1228, 1231 (9th Cir. 2015) ("the so-called 'Insular Cases' . . . established a less-than-complete
application of the Constitution in some U.S. territories");  *Igartua-De La Rosa v. United States*,
417 F.3d 145, 162 (1st Cir. 2005) (with respect to Puerto Rico, "There is no question that the
*Insular Cases* are on par with the Court's infamous decision in *Plessy v. Ferguson* in licen[s]ing
the downgrading of the rights of discrete minorities within the political hegemony of the United
States");  *Ballentine v. United States*, No. CIV. 1999-130, 2001 WL 1242571, at *7 (D.V.I. Oct.
15, 2001) ("Those who may not realize the extent to which the current status of the Virgin
Islands depends on an entirely repugnant view of the people who inhabited the Virgin Islands at
the time of their acquisition are invited to read the *Insular Cases*").  But this issue is not
presently before the court as the plaintiffs do not argue that strict scrutiny applies because a
suspect class is at issue.

House of Representatives because Puerto Rico is not a state" and noting that "the Constitution does not permit granting such a right to the plaintiffs by means other than those specified for achieving statehood or by amendment"). It must be said that the current voting situation in Puerto Rico, Guam, and the U.S. Virgin Islands is at least in part grounded on the *Insular Cases*, which have been described as "establish[ing] a less-than-complete application of the Constitution in some U.S. territories," *Paeste*, 798 F.3d at 1231, based on explicitly racist views which "in today's world seem bizarre." José Trias Monge, *Injustice According to Law: The Insular Cases and Other Oddities*, in Foreign in a Domestic Sense: Puerto Rico, American Expansion, and the Constitution, 228 (Duke 2001).

The inconsistencies between the constitutional rights afforded to United States citizens living in states as opposed to territories have "been the subject of extensive judicial, academic, and popular criticism." *Id.* (citing Juan Torruella, *The Insular Cases: The Establishment of a Regime of Political Apartheid*, 77 Rev. Jur. U.P.R. 1 (2008); Last Week Tonight with John Oliver: U.S. Territories, Youtube (https://www.youtube.com/watch?v=CesHr99ezWE)); *see also Igartua De La Rosa v. United States* (*Igartua II*), 229 F.3d 80, 85-90 (1st Cir. 2000) (Torruella, J., concurring). Earlier this year, Senator Elizabeth Warren spoke out about the impact that the lack of voting rights has on United States citizens residing in Puerto Rico, Guam, and the U.S. Virgin Islands, calling the current situation "absurd" and noting that these individuals have "second class citizen" status that has "real implications" for their lives. https://www.facebook. com/senatorelizabethwarren/ videos/vb.131559043673264/580677832094714/?type=2&theater. The episode entitled *Island of Warriors* for PBS' America By the Numbers highlights the

struggles of veterans in Guam, and asks if they have been forsaken by the country they swore to defend.  http://www.pbs.org/wgbh/ america-by-the-numbers/episodes/episode-102/.

This court's task, however, is not to opine on the wisdom or fairness of the challenged portions of the UOCAVA.   It can determine only the proper standard of review and then apply that standard to the plaintiffs' equal protection claim.  The court thus turns to these questions.

## A.  Legal Standard

The federal defendants filed a Rule 12(b)(6) motion to dismiss followed by a motion for summary judgment.  The plaintiffs filed a cross-motion for summary judgment directed at their claims against the federal defendants.  As both sides submitted Local Rule 56.1 statements of fact that expand on the factual allegations in the complaint, the court will consider those statements and apply the summary judgment standard.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In resolving summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.  Standard of Review: Strict Scrutiny or Rational Basis?

When evaluating an equal protection claim, the court must first determine the appropriate standard of review.  *See Dunn v. Blumstein*, 405 U.S. 330, 335 (1972).  The plaintiffs assert that strict scrutiny applies because the UOCAVA treats former Illinois residents who were eligible to vote in federal elections when they lived in Illinois, but who currently live in territories,

differently depending on where they reside.  Specifically, the plaintiffs take issue with the fact

that the UOCAVA compels Illinois to allow former Illinois residents who currently reside in the

NMI and who were qualified to vote in federal elections when they lived in Illinois to cast Illinois

absentee ballots but allows Illinois to deny the franchise to similarly situated individuals who

reside in Puerto Rico, Guam, and the U.S. Virgin Islands.  According to the plaintiffs, the

UOCAVA's "selective enfranchisement" of NMI absentee voters means that Congress singled

out Illinois absentee voters in Puerto Rico, Guam, and the U.S. Virgin Islands for disfavored

treatment, thereby depriving them of the fundamental right to vote.  Based on this reasoning, the

plaintiffs conclude that strict scrutiny applies.

### 1.      The Rational Basis and Strict Scrutiny Standards

"Laws duly enacted by the legislature come to court with a presumption of constitutional

validity, but the level of scrutiny brought to bear on these laws varies."  *One Wisconsin Inst., Inc.

v. Nichol*, 155 F. Supp. 3d 898, —, No. 15 C 324, 215 WL 9239014, at *2 (W.D. Wis. 2015)

(citing *Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993)).  If a law burdens a fundamental right, it

"is subject to strict scrutiny, meaning that the discriminatory action is permissible only if it is

narrowly tailored to address a compelling state interest."  *Better Broadview Party v. Walters*, No.

15 C 2445, 2016 WL 374144, at *6 (N.D. Ill. Feb. 1, 2016) (citing *Illinois State Bd. of Elections

v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("Restrictions on access to the ballot

burden two distinct and fundamental rights . . . . When such vital individual rights are at stake, a

State must establish that its classification is necessary to serve a compelling interest.")).

If no fundamental right is at issue, rational basis review—under which a law is constitutional if a plausible rational explanation supports it—applies. *Heller*, 509 U.S. at 320. Thus, the Supreme Court "many times [has] said" that:

> [R]ational-basis review in equal protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. Nor does it authorize the judiciary to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.

*Id*. at 319 (internal quotations, alterations, and citations omitted). "[R]ational basis review focuses on the [government's] justification for its actions, rather than on plaintiffs' disagreement with those actions." *One Wisconsin Inst., Inc. v. Thomsen*, No. 15-CV-324-JDP, 2016 WL 4059222, at *53 (W.D. Wis. July 29, 2016). Thus, the court must determine if "a rational relationship between the disparity of treatment and some legitimate governmental purpose" exists. *Heller*, 509 U.S. at 320.

### 2.     Does the UOCAVA Affect a Fundamental Right?

Generally, the right to vote is both "precious" and "fundamental." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966). Nevertheless, as discussed above, to the extent that the Constitution implicitly confers a right to vote on individuals, as opposed to giving the states "broad authority to regulate the conduct of elections, including federal ones, *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004), that right is conferred on citizens of a state. *See Bush*, 531 U.S. at 104 (citizens of "the several States . . . vote for Presidential electors"); U.S. Const. art. I, § 2, cl. 1-4 (the "People of the Several States" choose the members of the House of

Representatives); U.S. Const. amend. XVII ("[t]he Senate of the United States shall be composed of two Senators from each state, elected by the people thereof . . . . ").

Citizens residing in territories do not have a constitutional right to vote as citizens of a state do. *See Igartua II*, 229 F.3d at 83 (holding that "Puerto Rico, which is not a State, may not designate electors to the electoral college" so "residents of Puerto Rico have no constitutional right to participate in the national election of the President and Vice-President"); *Igartua-De La Rosa v. United States*, 417 F.3d 145, 148 (1st Cir. 2005) (en banc) ("That the franchise for choosing electors is confined to 'states' cannot be 'unconstitutional' because it is what the Constitution itself provides. Hence it does no good to stress how important is 'the right to vote' for President").

Without a constitutional right, there can be no fundamental right. *See Echavarria v. Washington*, No. 1:16-CV-107, 2016 WL 1592623, at *3 (W.D. Mich. Apr. 21, 2016) ("A fundamental right is not at issue in this case because there is no constitutional right to release on parole"); *Wolfe v. Alexander*, No. 3:11-CV-0751, 2014 WL 4897733, at *11 (M.D. Tenn. Sept. 30, 2014) (because there is "no constitutional right to be free of health-based dietary restrictions in prison . . there is no right being burdened, much less a fundamental right"); *Gutierrez v. Corr. Corp. of Am.*, No. 3:13CV98-MPM-DAS, 2013 WL 1800205, at *2 (N.D. Miss. Apr. 29, 2013) ("No fundamental right is implicated in this case, as there is no constitutional right to watch television"); *Thomas v. Rayburn Corr.*, No. CIV.A. 07-9203, 2008 WL 417759, at *3 (E.D. La. Feb. 13, 2008) ("The fact that the homosexual prisoners are currently housed in a non-working cell block likewise implicates no fundamental right, because a prisoner has no constitutional right to a prison job."). This is critical, as only "[t]he guaranties of certain fundamental personal rights

declared in the Constitution" apply to the territories. *Balzac v. Porto Rico*, 258 U.S. 298, 312-13 (1922); *see also Wal-Mart Puerto Rico, Inc. v. Juan C. Zaragoza-Gomez*, No. 3:15-CV-03018 (JAF), 2016 WL 1183091, at *46 (D.P.R. Mar. 28, 2016) (quoting *Puerto Rico v. Branstad*, 483 U.S. 219, 229 (1987) ("The United States Supreme Court has 'never held that the Commonwealth of Puerto Rico is entitled to all the benefits conferred' and limitations placed 'upon the States under the Constitution.'").[10]

The plaintiffs do not dispute that, as a general proposition, United States citizens residing in territories have no constitutional right to vote in federal elections. Instead, they say that this point is irrelevant because the UOCAVA allows individuals who were qualified to vote in federal elections when they resided in Illinois but now reside in the NMI to continue to vote in federal elections via Illinois absentee ballot but does not allow similarly situated individuals who moved from Illinois to Puerto Rico, Guam, or the U.S. Virgin Islands to vote in federal elections via Illinois absentee ballot. According to the plaintiffs, this differing treatment of former Illinois voters based on the territories they move to merits strict scrutiny.

First, where there is no constitutionally protected right to vote, a state's law "extend[ing] the right to vote to some non-residents does not implicate strict scrutiny." *See Snead v. City of Albuquerque*, 663 F. Supp. 1084, 1087 (D.N.M.) (rejecting a challenge to a state law extending

_____

[10]  It is true that some courts have held that "only fundamental constitutional rights necessarily apply in the territories." *Davis v. Commonwealth Election Comm'n*, No. 1-14-CV-00002, 2014 WL 2111065, at *3 (D. N. Mar. I. May 20, 2014) (citing *Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1990); *Wal-Mart Puerto Rico*, 2016 WL 1183091, at *46 ("To this day, only 'fundamental' constitutional rights are guaranteed to inhabitants of territories.") (internal quotations and alterations omitted). However, as discussed in the text, a right cannot be fundamental unless it is also constitutional.

the right to vote in municipal bond elections to certain non-residents), *aff'd by* 841 F.2d 1131

(10th Cir. 1987) (unpublished order).

Second, the plaintiffs' authority supporting their contention that strict scrutiny applies

because they have a fundamental right to vote all involves residents of a state.[11]  Based on this

authority, the plaintiffs conclude that the UOCAVA allows some citizens (former Illinois

residents who live in foreign countries and the NMI) to vote via absentee ballot but denies the

franchise to others (former Illinois residents who live in territories other than the NMI).  *See* Dkt.

48 at 8-9.  But as discussed above, United States citizens living in territories do not have the

same fundamental right to vote as United States citizens residing in Illinois who are qualified to

vote in federal elections.  An Illinois citizen who is qualified to vote in a federal election has a

fundamental right to vote.  In contrast, because Puerto Rico, Guam, and the U.S. Virgin Islands

are territories, not states, the fact that the individual plaintiffs are United States citizens who used

to be able to vote in Illinois does not mean that they retain their  fundamental right to vote when

they move from Illinois to Puerto Rico, Guam, or the U.S. Virgin Islands.  *See generally Tuaua*,

788 F.3d at 307-08 (rejecting the claim that "non citizen nationals" born in American Samoa

have a constitutional right to United States citizenship where the plaintiffs' cases supporting their

claim of a fundamental right to citizenship "do not arise in the territorial context" and thus "do

---

[11]  The following are illustrative samples of the plaintiffs' authority:  *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (challenge to the constitutionality of Virginia's poll tax), *Obama for Am. v. Husted*, 697 F.3d 423, 425 (6th Cir. 2012) (challenge to an Ohio law that prevented certain voters from casting in-person early ballots), *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (in the context of a challenge to durational residence requirements, holding that "[i]n decision after decision, this Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction"), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (challenge to Hawaii's prohibition on write-in voting).

not reflect the [Supreme] Court's considered judgment as to the existence of a fundamental right to citizenship for persons born in the United States' unincorporated territories").

The plaintiffs also direct the court's attention to *Dunn*, a Supreme Court case that holds that challenges to voting restrictions always merit strict scrutiny. 405 U.S. at 337 ("if a challenged statute grants the right to vote to some citizens and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest") (internal quotations omitted). The holding in *Dunn*, however, is not as broad as the plaintiffs suggest. The Court made its comments in *Dunn* in the context of surveying "state statutes that selectively distribute the franchise" to state voters, not statutes directed at United States citizens residing in United States Territories. *Id*. at 336. Thus, the plaintiffs' authority does not engage with the federal defendants' contention that residents of a United States Territory—as opposed to a state— do not have a fundamental right to vote in federal elections. Without a fundamental right (or a suspect class, which as discussed above, is not at issue in this case), strict scrutiny is not triggered.

Further, the plaintiffs assert that strict scrutiny applies to laws that extend a benefit to one class of individuals (here, United States citizens who were formerly qualified to vote in federal elections in Illinois and who currently reside in the NMI) while depriving similarly situated individuals (here, United States citizens who were formerly qualified to vote in federal elections in Illinois and who currently reside in Puerto Rico, Guam, and the U.S. Virgin Islands) of that same benefit. The plaintiffs' authority, however, involves a challenge to a law that provided benefits to men but not women. *Frontiero v. Richardson*, 411 U.S. 677, 682 (1973). The Court held that the law was subject to "close judicial scrutiny" because classifications based on sex,

like classifications based on race, alienage, and national origin, are subject to strict scrutiny. *Id*. The plaintiffs here have not argued that they belong to a protected class and that the UOCAVA unconstitutionally discriminated based on their membership in that class.[12]

The federal defendants' cases are similarly unhelpful, albeit for a different reason. On a positive note, their cases involve territories.[13] However, they all involve "a constitutional attack upon a law providing for governmental payments of monetary benefits." *Califano*, 435 U.S. at 5. This type of statute "is entitled to a strong presumption of constitutionality." *Id*. (internal

---

[12] The court does not express any views on this subject, as the plaintiffs have not raised it and the parties have not briefed it.

[13] The Territory Clause gives Congress the "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be construed as to Prejudice any Claims of the United States, or of any particular State." U.S. Const., Art. IV, § 3, cl. 2. In *Harris v. Rosario*, cited by the federal defendants, the Supreme Court held that the Territory Clause authorized Congress to set a lower statutory limitation on Aid to Families with Dependent Children payments to residents of Puerto Rico. 446 U.S. 651, 651 (1980) (per curiam). The Court rejected an equal protection challenge, concluding that Congress "may treat Puerto Rico differently from States [under the Territory Clause] so long as there is a rational basis for its actions." *Id*. at 651-52. The Court then concluded that the challenged statute satisfied rational basis review because "Puerto Rican residents do not contribute to the federal treasury; the cost of treating Puerto Rico as a State under the statute would be high; and greater benefits could disrupt the Puerto Rican economy." *Id*. (citing *Califano v. Torres*, 435 U.S. 1 (1978) (per curiam)). Similarly, in *Besinga v. United States*, also cited by the federal defendants, the Ninth Circuit held that "the broad powers of Congress under the Territory Clause are inconsistent with the application of heightened judicial scrutiny to economic legislation pertaining to the territories." 14 F.3d 1356, 1360 (9th Cir. 1994). And in *Quiban v. Veterans Admin.*, the court held that "the Territory Clause permits exclusions or limitations directed at a territory [regarding certain veterans' benefits] . . . so long as the restriction rests upon a rational base." 928 F.2d 1154, 1161 (D.C. Cir. 1991); *see also Consejo de Salud Playa de Ponce v. Rullan*, 586 F. Supp. 2d 22, 26 (D.P.R. 2008) (with respect to certain Medicaid payments, "[i]n an unincorporated United States territory Congress can also discriminate against the territory and its citizens so long as there exists a rational basis for such disparate treatment").

quotations omitted). In contrast, in this case, the right to vote, as opposed to a claim to monetary benefits, is at issue.[14]

The plaintiffs' challenge to UOCAVA's differing treatment of the NMI versus other United States Territories appears to be an issue of first impression. Given this, the court turns to principles that are generally applicable to constitutional challenges involving territories. "[T]he Constitution does not apply in full to acquired territory until such time as the territory is incorporated into, or made a part of the United States by Congress." *United States v. Lebron-Caceres*, No. CR 15-279 (PAD), 2016 WL 204447, at *7 (D.P.R. Jan. 15, 2016) (citing *Boumediene v. Bush*, 553 U.S. 723, 757-758 (2008); *Torres v. Commonwealth of Puerto Rico*, 442 U.S. 465, 469 (1979)). The NMI, Puerto Rico, Guam, and the U.S. Virgin Islands are all unincorporated territories. *Id*. (collecting cases). For unincorporated territories:

> Congress is not restricted except in 2 instances: (1) where constitutional provisions flatly prohibit Congress from enacting certain types of laws; and (2) in case of fundamental constitutional rights." *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1989). Otherwise, Congress may treat territories differently than states provided it has a rational basis for that treatment. *Harris*, 446 U.S. at 651. In this sense, unincorporated territories are subject to the plenary power of Congress subject to (1) structural constitutional limitations; (2) fundamental constitutional rights; and (3) the need for a rational basis for congressional action.

_____

[14] Relatedly, the federal defendants also contend that even outside the context of United States Territories, heightened scrutiny does not apply to every voting regulation limiting the franchise. In support, they cite authority about state restrictions that limit the ability to vote. *See*, *e.g.*, *Green v. City of Tucson*, 340 F.3d 891, 899 (9th Cir. 2003) (holding that state "[e]lection laws will invariably impose some burden on individual voters" but this does not mean that "every voting regulation [is subject] to strict scrutiny" and must "be narrowly tailored to advance a compelling state interest"). This line of cases does not engage with the plaintiffs' position that the UOCAVA is subject to strict scrutiny because it treats the NMI differently than other United States Territories by extending the franchise for federal elections to former state residents who reside in the NMI while refusing to allow similarly situated residents of Puerto Rico, Guam, and the U.S. Virgin Islands to vote.

*Id*.  The court has already found that the individual plaintiffs do not have a fundamental right to vote via Illinois absentee ballot in federal elections, and the plaintiffs have not alleged that the UOCAVA discriminates due to their membership in a suspect class.  *See Sweeney v. Pence*, 767 F.3d 654, 668 (7th Cir. 2014) ("[e]qual protection scrutiny is triggered when a regulation draws distinctions among people based on a person's membership in a suspect class or based on a denial of a fundamental right") (internal quotations omitted).

In addition, as noted above, the Territory Clause specifically authorizes Congress to make rules and regulations respecting territories.  U.S. Const. art. IV, § 3.  The UOCAVA applies to United States Territories and "does not distinguish between those who reside overseas and those who take up residence in Puerto Rico [and, as relevant here, Guam and the U.S. Virgin Islands], but between those who reside overseas and those who move anywhere within the United States.  Given that such a distinction neither affects a suspect class nor infringes a fundamental right, it need only have a rational basis to pass constitutional muster."  *Igartua I*, 32 F.3d at 10; *see also Romeu v. Cohen*, 265 F.3d 118, 124 (2d Cir. 2001) (holding that "the UOCAVA's distinction between former residents of States now living outside the United States and former residents of States now living in the U.S. territories is not subject to strict scrutiny").  The plaintiffs here focus on the UOCAVA's distinction between the NMI versus Puerto Rico, Guam, and the U.S. Virgin Islands, as opposed to the distinction between citizens residing in territories and citizens residing in states that was drawn in *Igartua I* and *Romeu*.  Neither distinction, however, infringes upon a fundamental right, which is the basis for the plaintiffs' position regarding strict scrutiny.

More generally, "a statute is not invalid under the Constitution because it might have gone farther than it did" as "a legislature need not strike at all evils at the same time."

*Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966) (internal quotations and citations omitted).

Instead, "it is well-established that 'reform may take one step at a time, addressing itself to the

phase of the problem which seems most acute to the legislative mind' without creating an equal

protection violation." *Lamers Dairy Inc. v. U.S. Dep't of Agr.*, 379 F.3d 466, 475 (7th Cir. 2004)

(quoting *Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 489 (1955)). Thus, the fact that

Congress drew a distinction between United States citizens/former state residents now residing in

the NMI versus United States citizens/former state residents who now reside in other territories

does not mean that it was required to extend absentee voting across the board to all territories.

Accordingly, the UOCAVA's differing treatment of the NMI versus Puerto Rico, Guam, and the

U.S. Virgin Islands does not trigger strict scrutiny.

**C.      The UOCAVA: Rational Basis Review Applied to the Plaintiffs' Equal Protection
          Claim**

First, the plaintiffs argue that the challenged portions of the UOCAVA are not supported

by a "compelling state interest." (Dkt. 48 at 11.) This is not the appropriate standard for

rational basis review. *See*, *e.g.*, *Heller*, 509 U.S. at 320.

Second, the plaintiffs argue that the UOCAVA impermissibly gives the NMI "favored

status" among territories. (Dkt. 48 at 12.) As the federal defendants correctly note, however, the

NMI's historical relationship with the United States is consistent with the UOCAVA's treatment

of the NMI. The NMI are a chain of islands "strategic[ally] located" in the North Pacific Ocean

in the area known as Micronesia. *See* https://www.cia.gov/library/publications/the-world-

factbook/ geos/cq.html; *United States v. Lebron-Caceres*, No. CR 15-279 (PAD), 2016 WL

204447, at *14 (D.P.R. Jan. 15, 2016). The NMI are just north of Guam, which is also located in

the Mariana Islands chain but is politically separate. *See* https://www.britannica.com/place/

Northern-Mariana-Islands.

Stepping back in time:

Spain controlled [the NMI] from the sixteenth century until the Spanish American War. In 1898 after the war ended, Spain ceded Guam to the United States and sold the rest of the Marianas to Germany. *Saipan v. Director*, 133 F.3d 717, 720 (9th Cir. 1998). Germany's brief control ended with the commencement of World War I, when Japan took possession of all islands except Guam. *Id*. After World War I, Japan continued to govern most of what is now considered Micronesia, including the Northern Mariana Islands, under a mandate from the League of Nations. *Gale v. Andrus*, 643 F.2d 826, 828 (D.C. Cir. 1980).

*Lebron-Caceres*, 2016 WL 204447, at *14.

After World War II, the United States administered the Trust Territory of the Pacific

Islands, which included all of the islands in the Mariana Island archipelago, pursuant to a

Trusteeship Agreement with the United Nations Security Council. *Mtoched v. Lynch*, 786 F.3d

1210, 1213 (9th Cir. 2015). "In 1969, the United States began negotiations with the inhabitants

of the Trust Territory directed to establishment of a framework for transition to constitutional

self-government and future political relationships." *Lebron-Caceres*, 2016 WL 204447, at *14.

During the negotiations, the islands comprising the Trust Territories divided into four groups:

the NMI, the Federated States of Micronesia, the Republic of the Marshall Islands, and the

Republic of Palau. *Id*.

Although the other portions of the Trust Territories opted for independent statehood or

"free association," the NMI:

elected to enter into a closer and more lasting relationship with the United States. Years of negotiation culminated in 1975 with the signing of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States (hereinafter 'Covenant'). Pub. L. 94-241, 90 Stat. 263

-32-

(1976). After a period of transition, in 1986 the trusteeship terminated, and [the NMI] was fully launched.

*Mtoched*, 786 F.3d at 1213; *see also* Howard P. Willens & Deanne C. Siemer, *An Honorable Accord: The Covenant Between the Northern Mariana Islands and the United States* 350-52 (2002). The parties agree that the Covenant became fully effective as of 12:01 a.m. on November 4, 1986 (approximately three months after Congress passed the UOCAVA).[15] On December 22, 1990, the United Nations Security Council officially terminated the United Nations Trusteeship Agreement between the Pacific Trust Territories, the United States, and the United Nations Security Council.

The Overseas Citizens Voting Rights Act of 1975 and UOCAVA were passed in 1976 and 1986, respectively, and neither included the NMI as part of the definition of the "the United States." At the time of the UOCAVA's enactment, NMI was not yet a United States Territory, as the parties' summary judgment submissions (which are consistent with the court's research) indicate that the Trusteeship Agreement under which NMI was supervised by the United Nations was still in effect, and the Covenant under which NMI became a United States Territory and

---

[15] See http://www.lawsource.com/also/usa.cgi?xcm for a helpful collection of links to proclamations concerning the NMI, including Proclamation No. 5564, dated November 3, 1986. This proclamation is entitled "Placing into Full Force and Effect the Covenant with the Commonwealth of the Northern Mariana Islands, and the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands." In that proclamation, then-President Reagan stated, " I determine that the Trusteeship Agreement for the Pacific Islands is no longer in effect as of . . . November 3, 1986, with respect to the Northern Mariana Islands." Proclamation No. 5564 at § 1. He also stated that "[t]he Commonwealth of the Northern Mariana Islands in political union with and under the sovereignty of the United States of America" and that "[t]he domiciliaries of the Northern Mariana Islands are citizens of the United States" as specified in the Covenant. *Id*. at § 2. Finally, he "welcome[d] the Commonwealth of the Northern Mariana Islands into the American family and congratulate[d] our new fellow citizens." *Id*.

granted American citizenship to its residents was not fully effectuated.  Accordingly, a rational reason supports the UOCAVA's exclusion of the NMI—which was not yet a United States Territory and had a unique relationship with the United States—from its definition of the territorial limits of the United States.

To support the rationality of a challenged statute, a defendant is not "limited to the justifications that the legislature had in mind at the time that it passed the challenged provisions—any rational justification for the laws will overcome an equal protection challenge." *One Wisconsin Inst.*, 2016 WL 4059222, at *53; *Heller*, 509 U.S. at 320-21 (the party challenging a statute must negate "every conceivable basis which might support it . . . whether or not the basis has a foundation in the record").  So even if the court accepts the plaintiffs' contention that "the NMI carve-out" in the UOCAVA was a "product of historical timing" and not a deliberate choice by Congress (Dkt. 58 at 7), the so-called "historical timing" supports the UOCAVA's constitutionality.  *See City of Chicago v. Shalala*, 189 F.3d 598, 605 (7th Cir. 1999) (holding that "a statute must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" so "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality"); *see also  F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (the legislature need not "articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature"); *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 946-47 (7th Cir. 2009) ("any rational basis will suffice, even one that was not articulated at the time the disparate treatment occurred").

Next, the plaintiffs approach Congressional purpose from a different angle, contending that Congress expressed its rationale for promoting overseas voting rights in the legislative history of the Overseas Citizens Voting Rights Act of 1975, UOCAVA's predecessor statute. The plaintiffs highlight the following legislative history:

> At present, even if a private citizen residing outside the United States could honestly declare an intent to return to the State of his last residence, he would have a reasonable chance to vote in Federal elections only in the 28 States and the District of Columbia which have statutes expressly allowing absentee registration and voting in Federal elections for citizens "temporarily residing" outside the United States. The remaining 22 States do not have specific provisions governing private citizens temporarily residing outside the United States. Furthermore, all 50 States and the District of Columbia impose residency requirements which private citizens outside the country for more extended periods cannot meet.

> The committee has found this treatment of private citizens outside the United States to be highly discriminatory. Virtually all States have statutes expressly allowing military personnel, and often other U.S. Government employees, and their dependents, to register and vote absentee from outside the country. In the case of these Government personnel, however, the presumption is that the voter does intend to retain his prior State of residence as his voting domicile unless he specifically adopts another State residence for that purpose. This presumption in favor of the Government employee operates even where the chances that the employee will be reassigned back to his prior State of residence are remote. The committee considers this discrimination in favor of Government personnel and against private citizens [that violates] the equal protection clause of the 14th amendment.

H.R. REP. 94-649, pt. 1, at 2, 1975 U.S.C.C.A.N. 2358, 2359-60. According to the plaintiffs, this shows that Congress intended the UOCAVA (the Act's successor statute) to extend the federal voting franchise to each and every overseas voter who is a United States citizen and a former resident of a state, regardless of the location of their current overseas residence.

The Overseas Citizens Voting Rights Act of 1975 defined "United States" as "the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin

Islands" but not "American Samoa, the Canal Zone, the Trust Territory of the Pacific Islands, or

any other territory or possession of the United States."[16] 89 Stat. at 1142.  Thus, it differentiated

between (1) the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands,

(2) the Canal Zone (which ended its relationship with the United States in 1979,

https://www.britannica.com/place/Canal-Zone), American Samoa (whose residents are United

States nationals, not citizens, *Tuaua*, 788 F.3d at 302), and the now-former Trust Territory of the

Pacific Islands (which included the NMI); and (3) other United States Trust Territories or

possessions.  The plaintiffs appear to be asserting that the court should strike down the relevant

portions of UOCAVA for lack of a rational basis based on Congress' intent as purportedly

expressed in the 1975 legislative history for the UOCAVA's predecessor statute, and find that

Congress actually meant to treat voters in all overseas locations alike when it enacted the

UOCAVA.  This is at odds with the language of the Overseas Citizens Voting Rights Act of

1975 as well as the UOCAVA's language.[17]  *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,

---

[16]   The Twenty-Third Amendment, passed in 1961, created the means by which the residents of the District of Columbia vote in Presidential elections.

[17]   The plaintiffs repeatedly contend that the Overseas Citizens Voting Rights Act of 1975 "***excluded*** former state citizens residing [in NMI] from the right to vote in federal elections in their prior states of residence." (Dkt. 48 at 12) (emphasis in original.)  They then conclude that "the federal defendants' argument—that the NMI was not addressed [in the UOCAVA] simply because it did not yet exist or have an established relationship with the United States—is wrong as a matter of history."  (*Id*. at 13.)  In support, the plaintiffs contend that the 1975 Act provides that citizens who "maintain a domicile . . . in any territory or possession of the United States"—which the plaintiffs claim includes the NMI—cannot vote in federal elections in their former state of residence. *Id*. at § 3(2).  However, the 1975 Act allowed former state residents residing in the NMI to vote absentee in federal elections as its definition of "United States" specifically excluded "the Trust Territory of the Pacific Islands."  *See* P.L. 94-203, § 2(3).  Thus, the 1975 Act treated the islands comprising the Trust Territory of the Pacific Islands like a foreign country because they were not United States Territories (and indeed, other than the NMI, none of the trust territories ever became United States Territories).  The plain language of the

-36-

469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose").

Next, the court agrees with the federal defendants that Congress could have reasonably concluded that because the NMI is the only United States Territory that used to be a Pacific Trust Territory and, as of the date of the UOCAVA's enactment, was not yet a United States Territory, it was more analogous to a foreign country, as opposed to the United States Territories of Puerto Rico, Guam, and the U.S. Virgin Islands. As noted above, the other Pacific Trust Territory Islands (the Federated States of Micronesia, Palau, and the Marshall Islands) chose independent statehood or "free association," but the NMI entered into a covenant with the United States that set forth specific parameters of the relationship. *Com. of N. Mariana Islands v. Atalig*, 723 F.2d 682, 691 (9th Cir. 1984); *An Honorable Accord*, at 57-194.

In doing so, the NMI's status as a former Trust Territory informed its relationship with the United States. When the United States administered the Trust Territories, it did so "based upon the President's treaty power conferred in Article II, Section 2, cl. 2 of the Constitution, rather than under the authority conferred upon Congress by the Territorial Clause." *Lebron-Caceres*, 2016 WL 204447, at *14. Thus, the United States acted as a trustee, not a sovereign power; "[i]ts authority derived from the trust itself." *Id*. (citations omitted).

_____

Overseas Citizens Voting Rights Act of 1975's reference to "any other territory or possession of the United States" did not bar former Illinois residents now living in the NMI from voting, given its specific language granting that right to the "Trust Territory of the Pacific Islands," which included the NMI. *See Loughrin v. United States*, — U.S. —, 134 S. Ct. 2384, 2390 (2014) ("courts must give effect, if possible, to every clause and word of a statute") (internal quotations and citation omitted).

Accordingly, "the Trust Territory was not considered a territory or an insular possession of the United States." *Id*. (collecting cases). "And so in approving the Covenant with the Northern Mariana Islands, the federal government was constrained by the Trusteeship Agreement." *Id*. (citations omitted).

"In contrast, the sovereignty held by Spain over Puerto Rico was formally transferred to the United States by way of the Treaty of Paris" and "[s]ince then, the United States has administered Puerto Rico through legislation enacted under the Territorial Clause. *Id*. The United States acquired Guam in 1898 when, during the Spanish-American War, Spain ceded Guam to the United States. *See United States v. Vega Figueroa*, 984 F. Supp. 71, 77 (D.P.R. 1997). The United States purchased the U.S. Virgin Islands in 1917. *Id*.; *An Honorable Accord*, at 293.

Courts have concluded that the position that the NMI has a "political status . . . distinct from that of unincorporated territories such as Puerto Rico" is "credible." *Com. of N. Mariana Islands*, 723 F.2d at 691 n.28. The rationale for the distinction is that "[u]nder the trusteeship agreement, the United States does not possess sovereignty over the NMI." *Id*.; *see also Davis*, 2014 WL 2111065, at *1 (summarizing the history of the NMI and its political relationship with the United States); *Lebron-Caceres*, 2016 WL 204447, at *14 (same). Instead, "[a]s a commonwealth, the NMI [enjoys] a right to self-government guaranteed by the mutual consent provisions of the Covenant . . . . No similar guarantees have been made to Puerto Rico or any other territory." *Com. of N. Mariana Islands*, 723 F.2d at 691 n.28; *An Honorable Accord* at 343 ("Against all odds, [the NMI] accomplished what no people preceding them had ever done—they joined the United States voluntarily on terms they had negotiated and approved").

In addition, in 2008, the NMI first received a non-voting delegate in the House of Representatives. 48 U.S.C. § 1751 (2008). The NMI was entitled to a Resident Representative to Congress as early as 1978, but that Representative "ha[d] no official status in the Congress." H. Rep. No. 108-761, at 5 (2005); *see also id.* at 3 (describing the NMI as "the last and only territory with a permanent U.S. population that has no permanent voice in Congress."). The plaintiffs say that this "reveal[s], at most, a pattern of unique dealings between the United States and the NMI" and assert that this is not enough to survive rational basis review. (Dkt. 58 at 9.) But the NMI's unique political status is a reason *supporting* its treatment in the UOCAVA, as the plaintiffs can prevail only if they negate "every conceivable basis which might support it . . . whether or not the basis has a foundation in the record." *Heller*, 509 U.S. at 320-21; *see also One Wisconsin Inst.*, 2016 WL 4059222, at *53 (the rationality of a challenged statute can be based on "any rational justification," not merely the "justifications that the legislature had in mind at the time that it passed the challenged provisions").

Moreover, until 2008, the NMI retained nearly exclusive control over immigration to the Territory. The transition to the full application of federal "immigration laws," as defined in § 101(a)(17) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(17), in the NMI will end on December 31, 2019. 48 U.S.C. § 1806(a)(2) ("There shall be a transition period beginning on the transition program effective date and ending on December 31, 2019, during which the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of the Interior, shall establish, administer, and enforce a transition program to regulate immigration to the Commonwealth, as provided in this section."). The plaintiffs have not pointed to any parallel provisions regarding

immigration to Puerto Rico, Guam, and the U.S. Virgin Islands.

Finally, the court notes that the plaintiffs' requested relief would not result in a universally applicable rule that permits all United States citizens in Puerto Rico, Guam, and the U.S. Virgin Islands to vote in federal elections. Instead, if the plaintiffs prevail, former Illinois residents who were qualified to vote in federal elections when they lived in Illinois who then moved to Puerto Rico, Guam, and the U.S. Virgin Islands would be able to vote in federal elections via Illinois absentee ballot. As another court considering a challenge brought by a Puerto Rican resident who had previously lived and voted in New York to, among other things, the UOCAVA's provisions preventing him from voting for President via a New York absentee ballot after he moved to Puerto Rico has stated:

> if the UOCAVA had done what plaintiff contends it should have done—namely, extended the vote in federal elections to U.S. citizens formerly citizens of a State now residing in Puerto Rico while not extending it to U.S. citizens residing in Puerto Rico who have never resided in a State—the UOCAVA would have created a distinction of questionable fairness among Puerto Rican U.S. citizens, some of whom would be able to vote for President and others not, depending [on] whether they had previously resided in a State. The arguable unfairness and potential divisiveness of this distinction might be exacerbated by the fact that access to the vote might effectively turn on wealth. Puerto Rican voters who could establish a residence for a time in a State would retain the right to vote for the President after their return to Puerto Rico, while Puerto Rican voters who could not arrange to reside for a time in a State would be permanently excluded.

*Romeu*, 265 F.3d at 125.[18] That reasoning applies equally to Guam and the U.S. Virgin Islands.

_____

[18] *Romeu* centered on the plaintiff's inability to vote after he moved from New York—where he was qualified to vote in federal elections—to Puerto Rico. This case, in contrast, centers on the differing treatment of Illinois qualified voters depending on the United States Territory to which they move. This distinction does not affect the applicability of the *Romeu* court's observation to this case. As in *Romeu*, the relief requested by the plaintiffs in this case would cause a similar inequality among United States citizens in Puerto Rico, Guam, and the U.S. Virgin Islands depending on whether they had ever lived, or could arrange to live, in a state and qualify to vote in federal elections there.

It is rational, at least as the term is understood in the context of rational basis review, to enact a law that does not differentiate between residents living in a particular United States Territory based on whether they could previously vote in a federal election administered by a state.[19]

For all of these reasons, the court finds that the UOCAVA's challenged provisions survive rational basis review. In reaching this conclusion, the court notes that it gave the parties' arguments the most serious consideration possible given the gravity of the plaintiffs' constitutional claims. However, the parties' submissions were often repetitive and lacking in substance, and the parties did not take full advantage of their ability to file written submissions adequately addressing the interesting, novel, and complex issues presented by this case.

## IV. CONCLUSION

For the above reasons, the federal defendants are entitled to summary judgment as to the plaintiffs' equal protection claim based on the UOCAVA. Thus, the federal defendants' motion for summary judgment [50] is granted, their motion to dismiss [42] is denied as moot, and the plaintiffs' cross-motion for summary judgment [47] is denied. The plaintiffs' standalone due process claim survives these rulings as the parties did not brief it. This case is set for status on September 9, 2016, at 9:30 a.m. The parties should be prepared to discuss further proceedings regarding the plaintiffs' due process claim against the federal defendants and their contention that

_____

[19] It is true that the NMI appears to differentiate in this way (*i.e.*, a United States citizen residing in the NMI who has never been eligible to vote in a state-administered federal election cannot vote for President at all, while a United States citizen who was eligible to vote in federal elections in Illinois and then moved to the NMI can cast an Illinois absentee ballot in a federal election). The plaintiffs, however, have failed to establish that given the undemanding nature of the rational basis standard and the NMI's unique relationship with the United States, the ability of some NMI residents to vote depending on their former state voting rights gives the plaintiffs a similar right.

portions of Illinois MOVE are unconstitutional due to the statute's treatment of American Samoa.

Date:  August 23, 2016                    _____/s/_____

                                          Joan B. Gottschall
/cc                                       United States District Judge