IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUIS SEGOVIA, et al., ) | |
| ) | |
| Plaintiffs, ) | Case No. 15 C 10196 |
| ) | |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| BOARD OF ELECTION ) | |
| COMMISSIONERS FOR THE CITY OF ) | |
| CHICAGO, et al., ) | |
| ) | |
| Defendants. ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The plaintiffs in this action are six United States citizens who are former residents of Illinois and who now reside in Puerto Rico, Guam, or the U.S. Virgin Islands, plus two organizations that promote voting rights in United States territories. The defendants are comprised of state and federal voting-related commissions and groups, as well as the United States of America and several individuals sued in their official capacities. A complete description of the parties and the underlying factual history of the case can be found in this court's August 23, 2016 Memorandum Opinion and Order (the "prior order") [63].

Before the court is the plaintiffs' second motion for summary judgment [70] and the federal defendants' cross–motion for summary judgment [77]. The plaintiffs raise two main arguments: first, they challenge the constitutionality of the Illinois Military Overseas Voter Empowerment Act ("Illinois MOVE"), arguing that this statute violates their equal protection rights by excluding former Illinois voters now living in Puerto Rico, Guam, and the U.S. Virgin Islands ("USVI") from voting by Illinois absentee ballot in federal elections, while allowing former Illinois residents living in American Samoa and the Northern Mariana Islands ("NMI") to

vote absentee. Second, the plaintiffs contend that Illinois MOVE and the Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"), infringe upon their substantive due process right to interstate travel.

As discussed below, the court concludes that Illinois MOVE does not violate the plaintiffs' equal protection rights because this statute's different treatment of former Illinois residents living in various U.S. territories is rationally related to legitimate state interests. These legitimate state interests include the synchronization of Illinois MOVE with applicable federal overseas and absentee voting laws such as the UOCAVA's predecessor statute, the Overseas Citizens Voting Rights Act ("OCVRA"). In arriving at this conclusion, the court rejects the plaintiffs' request for strict scrutiny review of Illinois MOVE and applies instead the more lenient rational basis review.

The plaintiffs' briefs focus extensively on the fact that Illinois MOVE tracks the language of the UOCAVA's predecessor statute, the OCVRA, instead of the more recent UOCAVA. However, the court notes that the practical effect of Illinois MOVE's alleged "outdatedness" is the enfranchisement of *more* former Illinois citizens living in U.S. territories than federal law currently provides. This consequence of enhanced absentee voting rights does not create a constitutional inequality because Congress specifically has authorized the states to provide more generous voting rights than those provided by the UOCAVA.

The court also rejects the plaintiffs' argument that Illinois MOVE and the UOCAVA unconstitutionally burden their right to interstate travel. The plaintiffs' inability to vote in federal elections by absentee ballot in their respective territories stems not from a violation of their right to travel, but from the constitutional status of Puerto Rico, Guam, and the USVI.

Thus, the court denies the plaintiffs' second motion for summary judgment and grants the federal defendants' cross-motion for summary judgment.

## I. LEGAL ARGUMENT

### A. RELEVANT STATUTES: the OCVRA, the UOCAVA, and Illinois MOVE

Before turning to the parties' summary judgment arguments, the court first identifies the three statutes involved in the court's ruling and the key definitions of each:

The Overseas Citizens Voting Rights Act (OCVRA), Pub. L. 94-203, 89 Stat. 1142, was enacted in 1976 and provided uniform procedures for absentee voting in federal elections. This federal statute imposed a range of responsibilities on the states, including Illinois, relating to absentee voting by citizens of the United States residing overseas, as those terms are defined in the statute. It has now been repealed but nevertheless is relevant in this case. It contained the following definitions:

- "State" means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands. 42 U.S.C. § 1973dd(2).

- "United States" includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands, but does not include American Samoa, the Canal Zone, the Trust Territory of the Pacific Islands, or any other territory or possession of the United States. 42 U.S.C. § 1973dd(3).

The Uniformed and Overseas Citizen Absentee Voting Act (UOCAVA), 52 U.S.C. § 20302, replaced the OCVRA in 1986. It also imposes a range of responsibilities on the states, including Illinois, relating to absentee voting in federal elections by uniformed service members or overseas voters, as those terms are defined in the statute. It contains the following definitions:

- "State" means a State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa. 52 U.S.C. § 20310(6).

3

- "United States," where used in the territorial sense, means the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and American Samoa. 52 U.S.C. § 20310(8).

Illinois MOVE, 10 Ill. Comp. Stat. § 5/20-1 et seq., likewise addresses absentee voting for Illinois residents who live overseas. It contains the following relevant definition:

- "Territorial limits of the United States" means each of the several States of the United States and includes the District of Columbia, the Commonwealth of Puerto Rico, Guam and the Virgin Islands; but does not include American Samoa, the Canal Zone, the Trust Territory of the Pacific Islands or any other territory or possession of the United States. 10 Ill. Comp. Stat. § 5/20-1(1).

Putting these three statutes together, the following result occurs: under the now repealed OCVRA, former Illinois residents living in Puerto Rico, Guam, and the USVI were not eligible to vote by absentee ballot because they were included within the statute's definitions of "State" and the "United States." Former Illinois residents living in the NMI and American Samoa were not similarly included in these definitions and thus could vote absentee. Under the UOCAVA, the same result occurred *except* that American Samoa also was included within the definition of "State" and "United States" so former Illinois residents living in American Samoa lost the ability to vote by absentee ballot. Under Illinois MOVE, which tracks the language of the OCVRA (the reason for this will be discussed at length below), American Samoa and the NMI are not included within the definition of the "[t]erritorial limits of the United States" and thus former Illinois residents living in either American Samoa or the NMI retain the right to vote by absentee ballot, although former Illinois residents living in Puerto Rico, Guam, and the USVI are not afforded this right.[1]

Illinois MOVE's tracking of the OCVRA instead of the UOCAVA creates a difference in treatment as to American Samoa that goes to the heart of the plaintiffs' equal protection

---

[1] A more detailed description of the interaction between the UOCAVA and Illinois MOVE is contained in the court's prior order. *See* Dkt. 63, at 8-10.

argument: under Illinois MOVE, former Illinois residents living in American Samoa may vote by absentee ballot. Had Illinois updated its election laws following the OCVRA's repeal in 1986 to mirror the newly enacted UOCAVA, these residents of American Samoa would have lost their right to absentee vote.

B.     **EQUAL PROTECTION UNDER ILLINOIS MOVE**

Having identified the operative statutes and their effect upon territorial residents, the court moves to the plaintiffs' first argument: that Illinois MOVE violates their right to equal protection under the 14th Amendment of the Constitution because they (residents of Puerto Rico, Guam, and the USVI who were formerly registered to vote in Illinois) are denied the right to vote absentee in federal elections while former Illinois citizens living in American Samoa and the NMI are afforded this right. The plaintiffs also focus upon the fact that Illinois MOVE tracks the language of the repealed OCVRA and thus treats American Samoa differently from the more recent UOCAVA. This, they contend, is arbitrary and violates their right to equal protection. The plaintiffs maintain that Illinois MOVE's disparate treatment of former Illinois residents living in various U.S. territories violates the Equal Protection Clause under any level of scrutiny, but they seek the application of a strict scrutiny standard of review.[2]

---

[2] The court limits its analysis of Illinois MOVE to American Samoa only. The plaintiffs allege that Illinois MOVE is arbitrary because it treats former Illinois residents now living in American Samoa **and the NMI** differently from similarly situated person livings in Puerto Rico, Guam, and the USVI. However, in its prior order, the court discussed at great length the NMI's unique historical relationship with the United States and expressly found that the UOCAVA's treatment of the NMI survives rational review scrutiny. Illinois MOVE and the UOCAVA treat the NMI identically: under both statutes, former Illinois residents living in the NMI may vote by absentee ballot. The court applies to Illinois MOVE the rational basis arguments contained in its prior order and finds that Illinois MOVE's treatment of the NMI—which mirrors that of the UOCAVA—is rationally based. There is no reason to recreate the wheel with respect to the NMI where there are no relevant differences between the two statutes and where it is clear that the federal government's treatment of the territories informs the states' voting laws, regardless of whether the states retain control over the mechanics of voting. The court therefore rejects the plaintiffs' argument that "Illinois has no comparable 'unique relationship' with the NMI . . .[and thus] the [c]ourt's grounds for sustaining UOCAVA do not apply to [Illinois] MOVE." Pls.' Mot., Dkt. 71, at 5.

A.     **Standard of Review**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S.C.A. Const. Amend. XIV, § 1. "The guarantee of equal protection coexists, of course, with the reality that most legislation must classify for some purpose or another." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 995 (N.D. Cal. 2010). When evaluating an equal protection claim, the court must first determine the appropriate standard of review, whether "strict scrutiny" or "rational basis." *See City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 452 (1985); *Sweeney v. Pence*, 767 F.3d 654, 668 (7th Cir. 2014) (noting that "[i]f either a suspect class or fundamental right is implicated, 'the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause.' But if neither condition is present, the proper standard of review is rational basis") (citations omitted).

The plaintiffs argue that they comprise a suspect class, thereby giving rise to strict scrutiny, because "historical experience has shown that Territorial residents have been effectively locked out of the political process." Pls.' Mot., Dkt. 71, at 6.[3] Alternatively, the plaintiffs argue that rational basis review is applicable. The court examines each standard of review to determine which is applicable.

---

[3] In its first motion for summary judgment, the plaintiffs did not advance a suspect class theory but instead sought to establish an equal protection violation based upon the existence of a fundamental right. This was unsuccessful. In its prior order, the court concluded, as have many other courts, that citizens residing in territories do not have a constitutional right to vote in federal elections in the same manner as citizens of the 50 states, and, further, that in the absence of a constitutional right to vote, there can be no violation of a fundamental right giving rise to strict scrutiny review. *See* Prior Order, Dkt. 63, at 24; *see also Romeu v. Cohen*, 265 F.3d 118, 123 (2d Cir. 2008) ("Citizens . . . living in U.S. territories possess more limited voting rights than U.S. citizens living in a State."). Stripped of their ability to make a "fundamental right" argument based on their right to vote, the plaintiffs now alight upon the "suspect class" language as a new approach to defeating rational basis review in favor of strict scrutiny review.

### 1. Strict Scrutiny Based on a Suspect Class

Classifications based on sex, race, alienage, and nationality are inherently suspect. *See Frontiero v. Richardson,* 411 U.S. 677, 682 (1973) (plurality). The Supreme Court first articulated the term "suspect class," along with its corresponding indicia of "suspectness," in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973), where the Court addressed whether poor school districts in Texas comprised a suspect class. Answering in the negative, the Court noted that: "[t]he system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Id*. at 28; *see also Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 128 S. Ct. 2146, 2147 (2008) ("equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others'") (citation omitted); *McCauley v. City of Chicago*, No. 09 C 2604, 2009 WL 3055312, at *3 (N.D. Ill. Sept. 18, 2009), *aff'd on other grounds,* 671 F.3d 611 (7th Cir. 2011).

The plaintiffs' argument that they are a suspect class is unpersuasive for a number of reasons. First, the plaintiffs have not provided the court with any authority supporting their contention that they comprise a suspect class based on their political powerlessness. The plaintiffs' discussion of cases where strict scrutiny has been applied to various statutes based on a suspect class do not involve U.S. territories or voting rights, and the plaintiffs have not drawn the court's attention to any aspects of these cases that are relevant or compelling to the issues presented here. *See, e.g*., *Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012) (finding a suspect class and applying heightened scrutiny to a statute that prohibited legally admitted aliens from

7

working as pharmacists in New York); *Adusumelli v. Steiner*, 740 F. Supp. 2d 582 (S.D.N.Y. 2010) (finding a suspect class and applying strict scrutiny to a statute preventing nonimmigrant aliens on temporary work visas from working as pharmacists in New York). It appears that some of the cases the plaintiffs cite were chosen because the statutes in those cases created improper classifications based on alienage, but it is settled law that Congress, and the states when implementing federal law, may continue to treat residents of territories differently from residents of the 50 states. *See Igartua v. U.S.*, 86 F. Supp. 3d 50, 55-56 (D. Puerto Rico 2015) (U.S. territories cannot be defined as "States" for purpose of Articles I and II of the Constitution); *Romeu v. Cohen*, 265 F.3d 118, 123 (2d Cir. 2001) (citizens living in territories possess more limited voting rights than citizens living in a State). It has been long established that residents of U.S. territories "lack equal access to channels of political power." *Quiban v. Veterans Admin.*, 928 F.2d 1154, 1160 (D.C. Cir. 1991). However, this lack of political power is consistent with Congress's right under the Territory Clause of the Constitution, U.S. Const. Art. IV, § 3, cl. 2 (the "Territory Clause"), to treat the U.S. territories differently, including the manner in which residents of the territories are, or are not, enfranchised with the right to vote in federal elections. The plaintiffs certainly are unhappy with their lack of political influence, but their attempt to create a suspect class based on this reality is not supported by legal precedent.

Furthermore, numerous other courts have held that Congress's power to make laws regarding the territories is subject to rational basis review. *See, e.g., Harris v. Rosario*, 446 U.S. 651, 651 (1980) (applying rational basis review to federal statute providing less federal financial assistance to Puerto Rican families than families living in the 50 states); *Besinga v. U.S.*, 14 F.3d 1356, 1360 (1994) (holding that "[b]ecause the Philippines was a territory of the United States at the relevant time, this dispute implicates Congress' power to regulate territorial affairs under the

Territory Clause. Controlling precedent dictates rational basis review); *Romeu v. Rossello*, 121 F. Supp. 2d 264, 282 (S.D.N.Y. 2000) (declining to find Puerto Ricans a suspect class for purposes of the Equal Protection Clause and applying rational review to provisions of the UOCAVA and New York election law). The court joins in this conclusion.

Additionally, the court finds without merit the plaintiffs' argument that because the Constitution includes no provision granting the 50 states the authority to treat residents of the territories differently, Illinois MOVE's disparate treatment of territorial residents should be reviewed under a heightened level of scrutiny. This unavailing argument collapses the separation of powers inherent in our system of federalism. Only Congress "shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. Art. IV, § 3, cl. 2. The states' power, meanwhile, is established by the Tenth Amendment to the Constitution, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amend. X. It is well-established that the states retain the power to conduct elections, but this power is informed by the federal government's equally well-established ability to treat the territories differently from the 50 states pursuant to the Territory Clause. *See Iguarta-De La Rosa v. U.S.*, 417 F.3d 145, 147 (1st Cir. 2005) (the territories are not considered "states" within the meaning of the Constitution). The plaintiffs' attempt to meld the distinct powers of the federal and state governments into one pot by arguing that the states have no broad authority to treat residents of the territories differently, thus triggering strict scrutiny review of a statute that does so (*see* Pls.' Mot., Dkt. 71, at 10), is without merit.

For these reasons, the court finds that former Illinois residents currently living in U.S. territories who may not vote by absentee ballot in federal elections do not constitute a suspect class. The plaintiffs' desire to participate in the federal election process is understandable, but the plaintiffs have not persuaded the court that they constitute a suspect class for purposes of engendering strict scrutiny of Illinois MOVE. Rational basis review is appropriate.[4]

### 2. Rational Basis Review as Applied to Illinois MOVE

On rational basis review, a classification in a statute enjoys a strong presumption of validity. *See Lyng v. Automobile Workers,* 485 U.S. 360, 370 (1988). "[T]hose attacking the rationality of the legislative classification have the burden 'to negative every conceivable basis which might support it.'" *F.C.C. v. Beach Commc'n*, 508 U.S. 307, 314-15 (1993) (citations omitted). Additionally, because a legislature is not required to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id*. at 315; *see also Nordlinger v. Hahn,* 505 U.S. 1, 15 (1992) (equal protection "does not demand for purposes of rational-basis review that a legislature or governing decision-maker actually articulate at any time the purpose or rationale supporting its classification"). As long as there is "a rational relationship between the disparity of treatment and some legitimate governmental purpose," the statute survives rational basis scrutiny. *City of Chicago v. Shalala*, 189 F.3d 598, 605 (7th Cir. 1999)

---

[4] The court also notes another problem with the plaintiffs' attempt to characterize themselves as a suspect class: doing so raises potential equal protection issues as to all other persons residing in U.S. territories who were not once Illinois residents. As noted in *Romeu*, "extend[ing] the vote in federal elections to U.S. citizens formerly citizens of a State now residing in Puerto Rico while not extending it to U.S. citizens residing in Puerto Rico who have never resided in a State . . . would have created a distinction of questionable fairness among Puerto Rican U.S. Citizens." 265 F.3d at 125. Similarly here, and as this court noted in its prior order, the plaintiffs' requested relief "would not result in a universally applicable rule that permits all United States citizens in Puerto Rico, Guam, and the U.S. Virgin Islands to vote in federal elections." *See* Prior Order, Dkt. 63, at 40 & n.8.

(citations omitted).  With these guidelines in mind, the court turns to the language of Illinois MOVE and the parties' arguments.

Illinois MOVE prevents former Illinois citizens living in Puerto Rico, Guam and the USVI from voting absentee in federal elections.  But it grants this right to similarly situated persons living in American Samoa (and the NMI).  Illinois MOVE is more expansive than the UOCAVA with respect to American Samoa.  The plaintiffs maintain that Illinois MOVE's failure to mirror the UOCAVA as to American Samoa lacks a rational basis and is arbitrary.

Defendants the Board of Election Commissioners for the City of Chicago and Marisel Hernandez respond that a rational basis exists for the disparate treatment under Illinois MOVE of former Illinois residents living in the various territories.  They explain that in 1979, the State of Illinois amended its election laws to define the territorial limits of the United States in such a way as to track precisely the language and provisions of the OCVRA.  The State of Illinois did not similarly amend its election laws following the OCVRA's repeal and the UOCAVA's enactment.  These state defendants do not provide any explanation for this inaction other than to say it was a "product of historical timing."  Defs.' Mem., Dkt. 74, at 8-11.

Any rational justification of an embattled statute will overcome an equal protection challenge.  The state defendants posit that Illinois MOVE mirrored the OCVRA beginning in 1979 to stay in compliance with federal law, and that this mirrored language simply remained in place even after the OCVRA was repealed in 1986.  The court accepts this explanation and finds that Illinois had (and has) a legitimate state interest in staying abreast of federal voting rights laws.  The adoption of language into Illinois MOVE that mirrored federal statutes such as the OCVRA legitimately achieved this purpose.

11

The court also finds that Illinois—certainly at least until 1986—had a legitimate state interest in treating American Samoa differently from Puerto Rico, Guam, and the USVI. American Samoa became a United States territory in 1900, "when the traditional leaders of the Samoan Islands of Tutuila and Aunu'u voluntarily ceded their sovereign authority to the United States Government." *Tuaua v. U.S.*, 788 F.3d 300, 302 (D.C. Cir. 2015), *cert. denied,* 136 S. Ct. 2461 (2016); *see also* Hon. Fofo I.F. Sunia of American Samoa, Address at the University of San Diego (May 14, 1986), 132 Cong. Rec. E1664-01, 1986 WL 791182. However, in 1949, this nation of islands and coral atolls rebuffed the Department of the Interior's attempt to introduce Organic Act 4500, which sought to incorporate American Samoa into the United States in the same fashion as already had been achieved in Puerto Rico and the USVI, and soon would be achieved in Guam. *See* http://www.newworldencyclopedia.org/entry/American_Samoa (last visited Oct. 27, 2015).[5]

American Samoa strives to preserve its traditional way of life, called *fa'a Samoa*, notwithstanding its growing ties with the United States. *See* U.S. Gov't Accountability Office, GAO-08-1124T (Sept. 18, 2008), at 6 (hereinafter "GAO Report"). American Samoa's constitution protects the Samoan tradition of communal ownership of ancestral lands by large, extended families, and "American Samoans take pride in their unique political and cultural practices, and . . .[their] history free from conquest or involuntary annexation by foreign powers." *Tuaua v. U.S.*, 951 F. Supp. 2d 88, 91 (D.D.C. 2013).

Federal law classifies American Samoa as an "outlying possession" of the United States. *See* Immigration and Naturalization Act ("INA") § 101(a)(29), 8 U.S.C. § 1101(a)(29). People

---

[5] An Organic Act is an act of Congress establishing a territory of the United States. The U.S. entered into an Organic Act with Puerto Rico in 1900, with the USVI in 1936 (repealed and replaced in 1954), and with Guam in 1950. *See* Pub. L. 56–191, 31 Stat. 77 (Puerto Rico); Pub. L. 64–389, 39 Stat. 1132 (USVI); (Pub. L. 83–517, 68 Stat. 497) (USVI); and 48 U.S.C. § 1421 et seq.) (Guam). In the absence of an Organic Act, a territory is classified as "unorganized."

born in American Samoa are U.S. nationals but not U.S. citizens at birth. *See* INA § 308(1), 8 U.S.C. § 1408(1). The State Department's Foreign Affairs Manual ("FAM") categorizes American Samoa as an unincorporated territory and states that "the citizenship provisions of the Constitution do not apply to persons born there." 7 FAM § 1125.1(b).

This basic understanding of the history of American Samoa—which illustrates that American Samoa has not followed the same path as Puerto Rico, Guam, and the USVI as concerns incorporation, citizenship, and cultural practices—leads the court to conclude that a rational basis supported Illinois' decision with respect to Illinois MOVE to track the language of the OCVRA and to exclude American Samoa from its definition of "[t]erritorial limits of the United States." At the time of the OCVRA's enactment, the federal government viewed American Samoa more like a foreign country than as part of the United States' territorial limits.

But what of the fact, as the Plaintiffs repeatedly point out, that Illinois neglected to update Illinois MOVE following the OCVRA's repeal and the UOCAVA's enactment? The plaintiffs maintain that Illinois' failure to update Illinois MOVE is an irrational act that creates an unconstitutional disparity among former Illinois residents living in the various territories. Again, the court disagrees. While it is true that Illinois MOVE remains predicated on an approach to American Samoa that was informed by the historical context of the 1970s and does not reflect the current treatment of American Samoa under the UOCAVA, the practical effect of Illinois MOVE's outdatedness is that it provides *more generous* voting rights to former Illinois residents than would exist had Illinois updated its laws to mirror the UOCAVA. And, critically, this state-based electoral generousness is clearly permitted under the OACAVA. An examination of the legislative history of the UOCAVA indicates a clear intention to preserve the ability of states to extend voting rights to individuals disenfranchised by the UOCAVA. *See* H.

13

R. Rep. No. 99-765, at 19, 1986 WL 31901, at *19 (deeming unnecessary for inclusion in the UOCAVA any language contained in the OCVRA stating that "this Act will not be deemed to require registration in any State in which registration is not required as a precondition to voting in a Federal election *nor will it prevent any State from adopting any voting practice which is less restrictive than the practices prescribed by this Act*" because the UOCAVA would not impinge on either activity) (emphasis added). The UOCAVA provides the voting practices floor upon which Illinois must stand, but at the same time it grants Illinois the right to expand upon these practices. The UOCAVA essentially provides a built-in rational basis explanation for states that failed to implement any narrowing of voting rights engendered by the UOCAVA.

In sum, the court denies the plaintiffs' equal protection challenge as to Illinois MOVE. It is true that Illinois MOVE is premised upon a repealed statute, but Illinois' failure to amend its election laws after the UOCAVA's passage resulted only in the ability of former Illinois residents living in American Samoa to retain their right to cast absentee ballots in federal elections. Any disparity created by Illinois MOVE's outdatedness is cured by the UOCAVA's express endorsement of the states' ability to provide greater voting rights than those provided in the UOCAVA. Additionally, the court finds that American Samoa's unique relationship with the United States rationally supports Illinois' decision to track the language of the OCVRA back in 1979. It matters not that Illinois continues to do so almost 40 years later.

The plaintiffs' attempt in this second round of summary judgment motions to pit federal and state voting statutes against each in an effort to find irrationalities that may further their goal of federal election enfranchisement cannot succeed. The underlying reality in this case is that Congress retains the right to dictate the terms of its relationship with the U.S. territories, and these terms sometimes shift and change depending on the individual territory and the historical

context informing each relationship. But even in the face of these shifts and changes, the federal statutes are not so rigid as to deprive the states of their ability to provide greater voting rights than those enumerated under federal law. The court's ruling today—which finds no unconstitutionality with regards to Illinois MOVE's treatment of American Samoa in a fashion that differs from the UOCAVA, or of its treatment of American Samoa and the NMI in a manner that is different from Puerto Rico, Guam, and the USVI—is grounded in large measure on the fact that Illinois retains the right to enfranchise persons disenfranchised by the UOCAVA and by the fact that Illinois' absentee and overseas voting laws are informed by rationally-based federal statutes constitutionally curtailing the federal election absentee voting rights of residents of United States territories.

C.    **Right to Interstate Travel**

The court now addresses the plaintiffs' second argument: that the UOCAVA and Illinois MOVE violate their "fundamental right to interstate travel, which is protected by the substantive component of due process." Pls.' Mot., Dkt. 71, at 2.

"The right to travel interstate, although nowhere expressed in the Constitution, has long been recognized as a basic fundamental right." *Andre v. Bd. of Trs. of Village of Maywood*, 561 F.2d 48, 52 (7th Cir. 1977) (citation omitted); *see also Perez v. Personnel Bd. of City of Chicago*, 690 F. Supp. 670, 673 (N.D. Ill. 1988) (noting that "[t]he right to interstate travel lacks any precise textual source but is considered fundamental to our federal system"). As noted in *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969), *overruled on other grounds by Edelman v. Jordan*, 94 S. Ct. 1347 (1974):

> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.

15

The right to travel encompasses three different components: "the right of a citizen of one State to enter and leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999). That being said, as the plaintiffs concede, it has not been determined conclusively whether the right to travel applies to travel between the 50 states and the U.S. territories. *See* Pls.' Mot., Dkt. 71, at 11 n.8.

If anything, the plaintiffs' arguments come closest to invoking the first prong of the three-part test—the right to leave one state and enter another. But neither the UOCAVA nor Illinois MOVE infringe upon the plaintiffs' right to leave Illinois and travel to a U.S. territory. They are free to come and go as they please, although their decisions to relocate to Puerto Rico, Guam, or the USVI have come at a cost. They moved outside of the State of Illinois and became residents of U.S. territories "in a constitutional scheme that allocates the right to appoint electors to States but not territories." *Romeu*, 265 F.3d at 126. As further noted in *Romeu*:

> A citizen's decision to move away from her State of residence will inevitably involve certain losses. She will lose the right to participate in that State's local elections, as well as its federal elections, the right to receive that State's police protection at her place of residence, the right to benefit from the State's welfare programs, and the right to the full benefits of the State's public education system. Such consequences of the citizen's choice do not constitute an unconstitutional interference with the right to travel.

*Id.* at 126-27. By moving to their respective territories, the plaintiffs gained the rights and privileges of citizens of their new residence. Their loss of the right to vote in federal elections was not caused by the UCOAVA or Illinois MOVE, but by their own decision to relocate. *See* Brian C. Kalt, *Unconstitutional but Entrenched: Putting UOCAVA and Voting Rights for Permanent Expatriates on a Sound Constitutional Footing*, 81 Brook. L. Rev. 466 (2016)

16

(opining that "the right to travel does not give citizens an unconditional right to emigrate without cost or consequence").

Nor do the plaintiffs' arguments successfully invoke the second and third prongs of the right to travel analysis. Neither the UOCAVA nor Illinois MOVE infringe upon the plaintiffs' right to be treated as welcome visitors in their respective territories or infringe upon their right to be treated like other citizens of their respective territories. *See Memorial Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 261 (1974) ("The right of interstate travel must be seen as insuring new residents the same right to vital governmental benefits and privileges in the States to which they migrate as are enjoyed by other residents."). Indeed, it is the very fact that the plaintiffs are treated the same as the other citizens of Puerto Rico, Guam, and the USVI that the plaintiffs find so unappealing. In truth, it is the denial of special treatment—the ability to vote by absentee ballot in federal elections (because of their former nexus to Illinois) despite the fact that citizens of Puerto Rico, Guam, and the USVI do not have the right to vote in federal elections—that the plaintiffs now try to convert into a due process violation based on their right to travel. But again, the denial of special treatment does not equate with an unconstitutional violation of the right to travel. *See Romeu*, 265 F.3d at 127. The plaintiffs' inability to vote by absentee ballot in their respective territories stems not from a violation of their right to travel, but from the constitutional status of Puerto Rico, Guam, and the USVI. *See Romeu*, 121 F. Supp. 2d at 278.

In *Califano v. Gautier Torres*, 435 U.S. 1 (1978), the Court addressed whether the Social Security Act's exclusion of Puerto Rico from Supplemental Security Income ("SSI") benefits constituted an interference with the plaintiff's constitutional right.[6] In that situation, the plaintiff

---

[6] The Social Security Act's 1972 amendment defined eligible individuals for SSI benefits as only those persons living within the 50 states and the District of Columbia. 42 U.S.C. § 1382c(e). However, as noted in *Califano*, 435 U.S. at 2, persons in Puerto Rico not eligible to receive SSI benefits were still eligible to receive benefits under pre-existing programs.

17

was a former resident of Connecticut who had moved to Puerto Rico. While noting that "laws prohibiting newly arrived residents in a State or county from receiving the same vital benefits as other residents unconstitutionally burdened the right of interstate travel," the Court refused to extend that doctrine to the premise that "a person who travels to Puerto Rico must be given benefits superior to those enjoyed by other residents of Puerto Rico if the newcomer enjoyed those benefits in the State from which he came." *Id*. at 4. The Court added that "[i]f there ever could be a case where a person who has moved from one State to another might be entitled to invoke the law of the State from which he came as a corollary of his constitutional right to travel, this is surely not it." *Id*. at 5.

Nor does the court find that this is such a case. The court already has rejected the plaintiffs' attempts to find Illinois MOVE and the UOCAVA unconstitutional. The court can find no way to allow the plaintiffs to create a right to travel violation premised upon these constitutional statutes.

## II. CONCLUSION

For the reasons set forth above, the court denies the plaintiffs' second summary judgment motion [70] and grants the federal defendants' cross-motion for summary judgment [77]. The clerk is directed to enter final judgment accordingly.


Date: October 28, 2016                            /s/

                                                                            Joan B. Gottschall
                                                                            United States District Judge